761 So.2d 670 (2000)
STATE of Louisiana
v.
Moneek M. GIBSON.
No. 99-KA-0946.
Court of Appeal of Louisiana, Fourth Circuit.
May 3, 2000.
*671 Sherry Watters, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant.
Harry F. Connick, District Attorney, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff.
(Court composed of Judge MIRIAM G. WALTZER, Judge DENNIS R. BAGNERIS, Sr., and Judge ROBERT A. KATZ).
WALTZER, Judge.
[1]Defendant, Moneek Gibson, appeals her conviction for manslaughter and her sentence of forty years, with thirty years suspended.

STATEMENT OF THE CASE
On 12 March 1998, Moneek M. Gibson was charged by bill of indictment with the second-degree murder of her boyfriend, Jasmin Norris.[2] At her arraignment, she pled not guilty. Following a two-day trial, a twelve-member jury found her guilty of manslaughter on 18 November 1998. The trial court ordered a pre-sentence investigation, and a sentencing hearing was held on 12 February 1999. Following the hearing, the trial court sentenced the defendant *672 to serve forty years at hard labor; however, the court suspended thirty years of the sentence.

STATEMENT OF FACTS
Dr. Paul McGarry, a forensic pathologist, performed the autopsy on the body of the victim, Jasmin Norris. The body had three stab wounds to the chest. One wound went into the left, upper front of the chest and traveled through the third rib into the heart. Another wound went into the side of the chest and hit the fourth rib. A third wound went down the back into the tissues of the skin; this wound did not penetrate the chest wall. The fatal wound was the wound entering the chest and penetrating the heart; it caused massive internal hemorrhage. Dr. McGarry opined that for a woman to cause this kind of injury a full arm movement with a definite forceful plunge of the knife into the chest wall was needed. Dr. McGarry found no defensive injuries on the victim.
Furthermore, Dr. McGarry testified that the victim had a blood alcohol level of .11. Additionally, cocaine and cocaine metabolites were found in the urine and in the eye fluid, indicating that the victim had taken cocaine in the last hours of his life.
Dr. McGarry opined that a blood alcohol level of .11 is ordinarily enough to cause a person to be under the influence of alcohol. However, the person would be in the early stages of that influence. Alcohol is not a depressant at that level, but inhibitions are released at that level. A person would act a differently from the way he ordinarily acted and might behave in ways that he would not ordinarily behave when sober. He further testified that cocaine is a stimulant; it tends to excite. It could increase aggression.
Dr. McGarry viewed photographs of the defendant taken the morning of the stabbing. He saw no evidence of injury to the skin or swelling of the neck. Dr. McGarry read a medical report giving the results of a medical examination conducted on the defendant on 18 February 1998. The physician examining the defendant found no evidence of trauma or airway obstruction. Dr. McGarry testified that if a person had been strangled he would expect to see bruising of the skin overlying the voice box, discoloration of the skin, scratching marks or fingernail-type marks and swelling of the area. If there was injury to the airway, trachea, windpipe or voice box, that would be evident to the examining doctor by swelling, discoloration and some difficulty in breathing. He would have expected the person to complain of some residual injury to the voice box and windpipe, i.e. hoarseness, a voice change, or some type of coughing and possible rasping.
On cross-examination, Dr. McGarry admitted that it was possible for someone's hand to be positioned in a certain way and not necessarily leave any marks, especially if the person being choked was wearing a sweater. However, to the extent the choking would have threatened life, he would have expected to see damage on the skin. Dr. McGarry noted that the medical records revealed that a complaint of a choking incident was made; i.e., the report stated, "Someone tried to choke me. No neck pain. No shortness of breath. No respiratory problems. No loss of consciousness.... No evidence of trauma. No evidence of airway obstruction."
When Detective Herman Cade arrived on the scene, the defendant was in the rear of the police car. The victim's body had already been transported to the Medical Center of Louisiana. Detective Cade took photographs of the crime scene. He observed bloodstains on the kitchen floor directly in front of the kitchen sink. Detective Cade did not see any disarray in the kitchen. No items were strewn about, and there was no evidence of a struggle. Detective Cade spoke to the defendant, who waived her rights and agreed to make a statement.
The defendant's taped statement, taken at the Fifth District station around 7:36 a.m. the morning of 18 February 1998, was *673 played for the jury. In the taped statement, the twenty-year-old defendant recounted the events that led to the victim's death. She stated that the victim arrived home around 4:45 a.m. She asked where he had been. He told her that he had been to the casino with his boss. They started arguing about him "messing around with a girl." When the argument first started, they were in the victim's father's bedroom. She repeatedly asked the victim where he had been because she knew he was lying. The victim told her to get out of his face, and then the victim grabbed her neck and started choking her by the sink in the kitchen. The defendant grabbed a knife out of the dish rack and was stabbing the victim on his arm, but he moved causing the knife to go into his chest. When asked how many times she stabbed the victim, the defendant stated she could not say how many times she stabbed him. When asked if it was more than once, she replied yes. When asked if it was more than twice, she stated no.
The defendant stated that she did not intentionally stab the victim, and she did not mean to kill him. Detective Cade asked the defendant if she received any injuries while the victim was choking her. She initially replied, "No, I was just telling him to let me go, and when he let me go, I saw the knife and I went to his arm with the knife." Detective Cade then asked, "When you grabbed the knife, he had already let you go, he was not choking you when you first grabbed the knife? The defendant then stated, "He still had his hand around my neck, and I took one of my hands and I grabbed the knife and when I went to stab him, that's when he was letting me go and he was like (sic), what you doing (sic)? What you doing (sic)?" When Detective Cade asked if the victim was choking her with one hand or both, she replied that he was choking her with one handhis right hand.
Based on the defendant's allegation of choking, Detective Cade sent the defendant to the Medical Center of Louisiana to be examined. Prior to her departure, Detective Cade arranged for Criminalist Thomatra Green to take photographs of the defendant at the Fifth District station. Detective Cade was present while the photographs were being taken; he did not notice any injuries to the defendant.
Detective Cade testified that the defendant had no prior felony arrests. and the victim had prior arrests for battery charges on women. One of the victim's prior arrests was for strangulation of an ex-girlfriend, Veronica Watts.
The victim's father, George Norris, testified that the victim lived in the home with him. His wife (the victim's mother) their other children also lived in the home. The victim worked as a cook at Pelican restaurant for ten years.
George Norris stated that he was awakened around 4:30 the morning of 18 February 1998, by the sound of his daughter, Monique Norris, running across the foot of his bed. When he awoke he heard the defendant in the kitchen hollering the victim's name. He also heard the defendant hollering, "Monique, I didn't aim to do this." George Norris went into the kitchen and found his son lying on his back, and the defendant was pumping him. He did not notice anything in the kitchen out of place. Everything was in order except for the knife on the kitchen counter. When he asked what happened, the defendant stated that she had cut the victim with a knife, and the knife was on the kitchen counter. When he asked the defendant why she cut his son, she replied, "I don't know. Mr. Norris, I don't know. I don't know."
George Norris never observed any violence between his son and the defendant. He denied having to drag his son off the defendant and/or that his son ever tried to choke the defendant. He recalled an incident that occurred in December of 1996 where he was called outside for a disturbance wherein the defendant was in his son's truck tearing everything loose in the truck. George Norris told her to get out *674 of the truck and go inside the house, but she was outraged and would not leave. He told his son to get out of the truck. When they walked to the steps of the house, the whole matter was resolved.
George Norris denied that his son was arrested for strangling his former girlfriend, Veronica Watts. He stated that his son was not strangling Watts, but his son was merely trying to get her out of the car. He was not present when the incident happened, but to his knowledge, there was no physical contact, and no blows were exchanged. George Norris denied hearing about his son strangling Mary, his first girlfriend.
Monique Norris, the victim's sister, testified that she was living in the home with her brother and her parents on the day her brother was killed. Between 4:30 and 5:00 that morning, Monique was unable to sleep because of a toothache, and the defendant was not sleeping either but was waiting for the victim to come home. When the victim came home and went into the kitchen, the defendant asked the victim to take her home. The victim told her to wait until he prepared himself something to eat. The defendant followed the victim into the kitchen. Three minutes later, Monique went into the kitchen and saw her brother on his knees. The defendant was standing over her brother's head with the knife in her right hand. Her brother had been stabbed. He told Monique to call 911 because the defendant had cut him. She then observed the defendant slap her brother's head. Monique went to her bedroom and called 911. When she returned to the kitchen, her father was in the kitchen.
Monique saw no evidence of a struggle inside the kitchen. Monique identified the knife that she saw in the defendant's right hand that morning. Monique never heard any arguing or raised voices between the victim and the defendant prior to the stabbing. On cross-examination, Monique admitted giving a statement saying she heard the defendant say, "I'm sick of you; tired of you, sick of you." However, she did not consider that as an argument. She heard nothing to indicate anyone's life was endangered. When Monique arrived in the kitchen she heard the defendant yelling the victim's name and saying, "Jasmine (sic), Jasmine, I didn't mean to do it."
Monique stated that her brother was her best friend. She admitted that her brother drank alcohol; but she had never known him to use cocaine. Monique had known the defendant for about two years prior to the incident.
Monique never knew the defendant and her brother to have a violent relationship. She never saw any abusiveness, and the defendant never told her anything about the victim choking her in the past. In fact, on the morning of the incident, the defendant never told her that the victim had choked her. She merely stated that she did not mean to do it.
When asked if she had heard about her dad having to haul her brother off the defendant from a pickup truck in December of 1996, she initially replied, "Yes, I did." When asked again, she stated, "Okay, yes, he may have. I don't know." Monique admitted to having been convicted of possession of cocaine and battery on a deputy sheriff.
Monique stated that her brother dated Veronica Watts for about seven years. She denied that her brother and Veronica Watts had a violent relationship. She stated that they had their ups and downs, but nothing serious enough to indicate Veronica's life was in danger.
Monique denied hearing of her brother being abusive to women before. She heard about Veronica Watts having him arrested twice, but she only heard of them getting into arguments.
Veronica Watts testified that she dated the victim for seven and a half years, and he was the father of her three boys. During the course of their dating, two incidents occurred wherein she called the *675 police. The first incident occurred because the victim wanted to leave and she did not want him to leave. Although the defendant was not choking her, she told the police officer that they were fighting and he had choked her. The second incident arose when the victim wanted her to go with him for a ride in the car. She did not want to go and became angry when he told her that he did not think they were going to make it because they did not see eye to eye. Watts denied that the victim was ever abusive or violent towards her.
On cross-examination, Watts admitted that all the information on the two separate police reports introduced into evidence concerning her name, date of birth, social security number and address was correct. However, she testified that the statements in both police reports that the victim had choked her were false. She also testified that, contrary to the information given in the police reports of the incidents, no bruises were found on her body.
Watts knew the victim liked to drink a beer or two, but to her knowledge he never used cocaine. He definitely never used cocaine around her and her children. Her relationship with the victim ended about three years before his death when he said he did not want to be bothered with her.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NUMBER 1
In the first assignment of error, the defendant argues the state failed to prove beyond a reasonable doubt that she did not act in self-defense.
In State v. Smith, 94-1502, p. 2 (La.App. 4 Cir. 1/19/95); 649 So.2d 1078, 1081, this court set forth the standard for evaluating the sufficiency of the evidence to support a defendant's conviction when it stated:
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecutor, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. at 2789[, 61 L.Ed.2d 560 (1979)]; State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (1988).
Although the defendant was charged with second degree murder, the jury convicted her of the responsive verdict of manslaughter, which is defined in LSA-R.S. 14:31 in part:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed
"Sudden passion" and "heat of blood" are not separate elements of the offense but are mitigating factors which the defendant must establish by a preponderance of the evidence. State v. McClain, 95-2546 (La. App. 4 Cir. 12/11/96); 685 So.2d 590; State v. Camp, 571 So.2d 195 (La.App. 4 Cir. 1990).
The defendant does not dispute that she killed the victim. She insists, however, that her conviction cannot stand because she only stabbed the victim in self-defense because he was choking her. *676 As noted by this court in State v. McClain, 95-2546 at pp. 8-9, 685 So.2d at 594:
A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or receiving great bodily harm and that the homicide is necessary to save himself from that danger. La. R.S. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Lynch, 436 So.2d 567 (La.1983); State v. Brumfield, 93-2404 (La.App. 4 Cir. 6/15/94); 639 So.2d 312. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger. State v. Dozier, 553 So.2d 911 (La.App. 4 Cir.1989), writ denied 558 So.2d 568 (La.1990). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id. However, a defendant who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that the defendant desires to withdraw and discontinue the conflict.
The defendant argues that the facts showed that 1) the victim was under the influence of alcohol and cocaine; 2) he committed three prior acts of aggression against either the defendant or his former girlfriend, Veronica Watts; 3) he was much larger than the defendant; 4) the defendant told the police and the doctors that the victim tried to choke her. For these reasons, she argues it is clear that she had a reasonable belief that she was in imminent danger of death or great bodily harm when she stabbed the victim.
Apparently the jury did not believe that the defendant was acting in self-defense when she stabbed the victim three times. A review of the testimony does not reveal that the jury was in error when it rejected the defendant's plea of self-defense. At the sentencing hearing, the defendant claimed she stabbed the defendant because he was trying to choke her. The statements made by the defendant in the taped confession clearly demonstrate that it was the defendant who started the argument because she was upset over the victim "messing around with a girl." She also believed the victim was lying to her. After she asked him to take her home, the victim allegedly told her to get out of his face. Although she stated that he choked her, it is not totally clear that he was still choking her when she grabbed the knife and stabbed him. She initially stated that she grabbed the knife when he let go of her, but she later stated that he still had one hand around her neck when she stabbed him. Irrespective, she candidly admitted that she received no injuries from the choking. These factors tend to negate a finding that the defendant thought she was in danger of death or great bodily harm when she stabbed the victim.
The evidence presented at trial casts serious doubt as to whether the victim tried to choke the defendant prior to the stabbing attack. The victim's sister, who was awake when the victim came home that morning, heard no struggling or arguing. She merely heard the defendant ask the victim to take her home. The victim's sister heard the defendant tell the victim she was sick and tired of him. However, she heard nothing to indicate that the victim had attacked the defendant. The victim's father was asleep in the very room the defendant claimed the argument began; yet the father heard no arguing.
When first asked why she stabbed the victim, the defendant did not tell the victim's *677 father or sister that he was choking her, but she stated that she did not know why she stabbed the victim. There was no sign of a struggle in the kitchen. Additionally, the police officer investigating the homicide testified that the defendant had no bruises on her neck, and none of the photographs introduced into evidence show any bruises on her body.
While it is true that there was undisputed testimony that alcohol and cocaine were found in the victim's body, there was no testimony as to how those substances affected this particular victim. Dr. McGarry testified that the victim would have been in the early stages of being considered under the influence of alcohol, and that he "might" have behaved differently than he ordinarily would. He also testified that cocaine acts as a stimulant and "could" increase aggression. The jury apparently did not believe that the presence of these substances caused the victim to choke the defendant.
The defendant's argument, that the evidence showed the victim had committed prior acts of violence against her and/or his prior girlfriend and because of this she reasonably believed she was in danger of death or great bodily harm, has no merit. The evidence concerning whether the victim had prior acts of violence is ambiguous at best. The police reports introduced into evidence apparently contained clear references to the victim choking his former girlfriend, Veronica Watts, on two separate occasions. Notwithstanding reports of the officers that Watts had bruises on her body, Watts testified that the victim never choked her and that he never abused her. No testimony was introduced to show the defendant knew of these alleged prior acts of violence prior to the time that she stabbed the victim.
As to the alleged act of violence against the defendant, the evidence again was ambiguous. The victim's father denied ever having to drag his son off the defendant. He testified that there was a disturbance wherein the defendant was the person who was enraged to the extent that she was tearing up his son's truck. Because the defendant would not leave, he told his son to get out of the truck. The testimony of Monique Norris, the victim's sister, appears to contradict the father's testimony. When asked if she heard about her father having to haul the victim off the defendant in an incident that occurred in December of 1996, Monique initially answered that she had heard of this. However, she further testified that her father may have, but she really did not know. There was no testimony to indicate that Monique was present when this incident occurred. The jury certainly had ample evidence to conclude that the victim had not been abusive on prior occasions.
The most damaging testimony that tended to negate the defendant's claim of self-defense was that given by Dr. McGarry. He testified that he found no defensive injuries on the victim, suggesting that the victim made no effort to protect himself. When considered in conjunction with the fact that one of the three stab wounds inflicted on the victim was a stab in the back, the jury had sufficient evidence from which to conclude that the defendant had no justifiable reason for stabbing the victim three times. Considering all the evidence, the State proved beyond a reasonable doubt that the defendant did not stab the victim in self-defense.
Reviewing the evidence in the light most favorable to prosecution and according great deference to the jury's decision to accept and reject testimony, it appears that the evidence was sufficient to prove the defendant guilty of manslaughter beyond a reasonable doubt.

ASSIGNMENT OF ERROR NUMBER 2
The defendant argues that the forty-year sentence imposed by the trial court was excessive under the circumstances.
The sentencing range for manslaughter under LSA-R.S. 14:31 is zero to forty years. Although the trial court sentenced the defendant to serve the maximum sentence *678 of forty years, the court suspended thirty years of the sentence, noting that the defendant would only have to serve ten years. The court further provided that the defendant's release on parole would be conditioned upon her enrolling in some type of anger management program. The sentence was clearly within the sentencing range for manslaughter.
However, a sentence may be reviewed for constitutional excessiveness even though it is within statutory guidelines. State v. Cann, 471 So.2d 701, 703 (La.1985). In reviewing a sentence for excessiveness, the Court must first determine whether the trial court complied with LSA-C.Cr.P. art. 894.1 in imposing the sentence and then determine whether the sentence is too severe given the circumstances of the case and the defendant's background. State v. Lobato, 603 So.2d 739, 751 (La.1992). If the sentence needlessly imposes pain and suffering and is grossly out of proportion to the seriousness of the offense so as to shock our sense of justice, then it may be determined to be unconstitutionally excessive as violative of LSA-Const. art. 1, § 20 (1974). Id. However, a sentence imposed will not be set aside absent a showing of abuse of the trial court's wide discretion to sentence within statutory limits. Id.
At the sentencing hearing of 12 February 1999, the State called four witnesses to testify. Reverend Josh Crayton testified that he had known the Norris family for thirty-six years, and they were all very good people. The victim attended school with his son and was always a good person. The victim grew up in the neighborhood, and Reverend Crayton never knew him to harm anyone. In fact, he never even heard of the victim ever being in any fights.
George Norris, the victim's father, stated that his son was the nicest person one would want to meet. He and his wife were sickly, and the victim took care of them. The victim cooked for them, and the victim always helped his father dress his mother before he left for work. The victim was their only son. Both parents miss him very much, as do the victim's children. He stated that the defendant killed his son for nothing, and she deserved to be punished.
Virgil Smothers, the victim's first cousin, stated that he and the victim were the same age and grew up together. The victim taught him to play basketball and was one of his biggest fans when he played football. The victim was hardworking, and the past year had been very hard on the entire family. Smothers did not know the defendant, but he told the court that it was his hope that justice would be served. The witness stated that he had never seen the victim high on drugs and he never heard of the victim laying his hand on a woman.
Bertha Norris, the victim's mother, read a statement to the court. She stated that her son was a good child throughout his life; he never gave his parents any trouble. He was always smiling, and he could make you laugh even if you felt sad. The victim was their only son, and he was the best son. She stated that the defendant was a good father to his children.
The record also contains a letter from the victim's sister, Angelique Norris. She stated that her family was grieving and she stated that they hope the defendant got the time that she deserved.
The defendant exercised her right to make a statement to the court. She begged for forgiveness; and she stated that she was sorry for what happened. She said that the victim was her lover for two years, and his family knew her for these two years. The family knew she was a nice person, and they knew she respected them and never had harmed them. She stated that the killing happened out of self-defense. She never meant to hurt the victim or his family. She stated that she was hurting and grieving. She stressed that she has two children to raise and that she will have to tell her children what *679 happened that day. She expressed a hope that the victim's family would forgive her.
In addition to the testimony heard at the sentencing hearing, the trial court also had the benefit of a presentence investigative report prepared by the Probation and Parole division of the Department of Public Safety and Corrections. The Department concluded that the defendant was not eligible for probation because of the violent nature of the offense. The report showed that the defendant was twenty years old at the time the offense was committed. At the time of the report she had two children by the victim.[3] The defendant completed the ninth grade and dropped out of school in the tenth grade. She took the GED on one occasion but was not successful in passing the test; she made no further attempts to take the test again. The defendant's employment history was sparse.
A review of the trial court's statements at sentencing supports a finding that the trial court articulated reasons for the sentence, and that it sought to tailor the sentence to the offender and the offense. Prior to sentencing the defendant the court stated:
... I've read the pre-sentence investigation in this case, and nothing has changed in terms of how I see this. That is, Miss Gibson, you were upset because Jasmine did not come home that night, and you were upset. And as best as I can tell from this, you were upset because you believed that Jasmine was with some other woman, and that was the basis of your upsetment (sic), that he was, in fact, with some other woman. And because of your jealousy, because of the jealousy that you felt, because he was obviously doing something you thought he shouldn't have been, you acted, reacted to that. That reaction included, obviously, picking up a knife and stabbing him with that knife. Whether he was choking you at the time, I don't know. I don't know. But in all honesty, even if he was choking you at the time, that does not justify your picking up a knife and killing him. When you take into consideration that his entire family, at least a goodly portion of the family, was but feet away ... So to pick up a knife and to stab him with the knife, as best that I can tell, that was done because of your anger. That was done because you were angry. Did you intend to kill him, stabbing him with the knife? I don't know. Honestly, I think not. I don't think necessarily that you intended to kill him when you picked the knife up, and you cut him with it. But I think you intended to pick the knife up and cut him. I think you did, but I don't necessarily believe you intended his death. I don't think so, I truly don't. But this, of course, Moneek, is tragic for those people who are sitting there. It's tragic. It's tragic for those children who are sitting there, Moneek. It's tragic. It's tragic for the children that you have. This is tragic. It really is. Your children have lost their father and their mother. Really, they've lost both, and that's a tragedy. It sincerely is. Maybe at some point in our lives, yours, mine, everyone in this room, we will get to a point in our lives where we will not act out of that kind of anger. We will not pick up the knife or the gun and use the same simply because we are upset. Because, of course, our loved one has decided to love someone else, we won't, as a result of that information, pick up something and kill our loved one with it, because we are upset. Our loved one is dead, regardless.... (emphasis added)
The remarks made by the trial court indicate that the trial court made an earnest attempt to balance the equities on all side and come up with a punishment tailored to fit the offender and the offense. It appears the court adequately complied with the provisions of LSA-C.Cr.P. art. 894.1.
*680 Once adequate compliance with article 894.1 is found, the court may consider whether the sentence is excessive in light of sentences imposed by other courts in similar circumstances. This sentence is not excessive in light of the jurisprudence.
The defendant was charged with second-degree murder and convicted of manslaughter for killing the father of her two children. While it is true that the defendant is a somewhat youthful first offender, maximum sentences for manslaughter convictions have been affirmed in several cases even where the defendant had no prior convictions.
In State v. Bowman, 95-0667 (La.App. 4 Cir. 7/10/96); 677 So.2d 1094, writ denied, 96-2070 (La.1/31/97); 687 So.2d 400, this Court affirmed a thirty-three year manslaughter sentence for a sixteen-year-old first offender who drove the car but did not pull the trigger in a drive-by shooting. In State v. Maxie, 594 So.2d 1072 (La.App. 3 Cir.1992), writ denied, 598 So.2d 372 (La.1992), the Third Circuit affirmed a statutory maximum sentence of twenty-one years at hard labor for manslaughter for a twenty-two year old defendant with no prior convictions who shot the victim three times. In State v. King, 563 So.2d 449 (La.App. 1 Cir.1990), writ denied, 567 So.2d 610 (La.1990), the First Circuit affirmed a twenty-one year maximum sentence for a defendant who fired one shot at point blank range killing his estranged wife.[4] The Fifth Circuit affirmed a thirty-five year sentence for a first offender in State v. Johnson, 95-210 (La.App. 5 Cir. 7/25/95); 659 So.2d 846, 848.
The trial court has great discretion in sentencing within statutory limits. State v. Soraparu, 97-1027 (La.10/13/97); 703 So.2d 608; State v. Trahan, 425 So.2d 1222 (La.1983). A sentence should not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Washington, 414 So.2d 313 (La. 1982).
In determining whether the defendant's forty-year sentence is excessive the court cannot ignore the fact that the court suspended thirty years of the sentence. The defendant is actually only required to serve ten years as long as she can show that she is able to live in society as a law abiding citizen. Under these circumstances, it can not be said the court abused its discretion in sentencing the defendant. This assignment of error has no merit.

CONCLUSION
For the above reasons, we affirm the defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] THIS OPINION WAS APPROVED BY JUDGE KATZ PRIOR TO HIS DEATH.
[2] The deceased was referred to interchangeably as Jasmin or Jasmine throughout the proceedings.
[3] While being examined the day of the homicide, it was discovered that the defendant was pregnant. The defendant's second child was born while she was incarcerated.
[4] However, the appellate court amended the sentence to twenty-one years to be served without benefit of probation, parole or suspension of sentence for five years.