DAVID S. GORBATY, Judge.
hOn November 15, 2003 the defendant Romallis Stakes was charged with two counts of attempted second-degree murder, charges to which he subsequently pled not guilty. On October 25, 2004 a jury found him guilty of two counts of aggravated battery. At sentencing on January 21, 2005 Stakes filed a motion for new trial and for post verdict judgment of acquittal. *681 On February 18 the court denied the motion for post verdict judgment of acquittal but granted the motion for new trial. In response to the State’s request, the court issued written reasons for judgment on February 25. The State noted its intent to seek relief, and the court granted the State until April 25 to do so. The court subsequently granted timely motions for extension to May 25 and then to June 6. The State filed its writ in this court on June 7. There is no indication of a new trial date; a status hearing was set for September 15, but it did not occur, and the docket master lists no further date.
The State of Louisiana took writs to this court, which were granted, and the case was remanded for sentencing. Defendant subsequently took writs to the Louisiana Supreme Court, which were granted. State v. Stukes, 2006-0766 (La.6/30/06), 933 So.2d 131. The Supreme Court ordered that the matter be remanded to this court for briefing, argument, and opinion.
pFor the reasons set forth below, we grant this writ, reverse the trial court’s ruling, reinstate the jury’s verdict, and remand this matter for sentencing.

FACTS

Joy Lewis testified that she, her cousin Bruce Salvant, Jr., and a friend Greg Gaines attended a Saints game on September 28, 2003. After the game, they agreed to meet at Club 30 Something. Ms. Lewis testified that she parked her car behind the club, and after she walked to the front of the club she saw the defendant Romallis Stukes standing in front talking with her cousin Ashley. Ms. Lewis stated that because she could see Salvant and Gaines waiting for her near the doorway, she merely said hello to Ashley and Stukes as she passed by them. She stated that she did not personally know Stukes, but she recognized him because he had visited a bar where she worked. She testified that after she had passed him, Stukes began calling to her, and then called her names when she would not respond to him. She stated that she continued walking toward Salvant (who was on his cell phone) and Gaines, and when she reached Gaines, Stukes told Gaines to get her attention. Ms. Lewis testified that Gaines told Stukes he would not do so because Stukes had been “disrespecting” her. This led to an exchange of words between Stukes and Gaines.
Ms. Lewis stated that when Salvant finished his phone conversation, she and Sal-vant started to walk into the club, while Gaines and Stukes continued to exchange words. Ms. Lewis testified that she heard Stukes say, “I got something for y’all.” At that point, she saw another man give Stukes the key to a nearby car. Stukes went to the car and returned with a gun in his hand. Ms. Lewis testified that she heard at least two shots and saw Salvant fall to the ground. She and Gaines ran inside the club, and at that point she noticed that Gaines had also been shot. She 13testified that her brothers were inside the club, and she told them that Salvant had been shot. They went back outside, and she called the police, giving them Stukes’ description as well as the descriptions and license plate numbers of his car and the car next to his.
Ms. Lewis denied brandishing a weapon at Stukes, and she insisted that Gaines was not armed that night, explaining that Gaines had gone through a metal detector at the game earlier that evening. Ms. Lewis testified that sometime later she viewed a photographic lineup at the Seventh District police station from which she chose the photo of Stukes as the man she saw shoot Salvant. She also positively identified Stukes at trial.
Ms. Lewis admitted that Gaines and Stukes exchanged words prior to the *682 shooting, but she testified that the exchange was not “heated.” She also testified that Salvant was not involved in the argument at all. She insisted that no one had threatened Stakes prior to the shooting. She testified that she had consumed one alcoholic beverage prior to going to the Saints game, but she denied drinking anything at the game.
Greg Gaines testified he attended the Saints game with the Lewis/Salvant family. He stated that after the game, he went to Club 30 Something with James and Ryan Lewis, Joy’s brothers. He stated that when they arrived at the club, he looked inside briefly and then waited outside for Ms. Lewis to arrive. He testified that when he noticed her walking up to the club, she passed by Stakes. Gaines testified that he heard Stakes say something rude to Ms. Lewis, which she ignored, but Stakes continued to harass her. Gaines stated that when Ms. Lewis approached him, Stakes asked him to get her attention. He refused, and the two men exchanged words. Ms. Lewis indicated she wanted to go inside, and as they turned |4to go Stakes told them he had something for them. Gaines testified that Stakes went to a nearby car, got a gun, and began firing at them. Gaines stated that he heard two shots, one of which hit him. He stated that he stumbled inside the club and collapsed. He testified he did not know Salvant had been shot until emergency workers removed him from the club later that night. He positively identified Stakes at trial as the man who shot him.
Gaines denied having a weapon that night, pretending he had a weapon, or threatening Stakes. On cross-examination, he denied telling the police he heard only one shot. He stated that he saw Stakes shooting at him and his companions, but he did not actually see where the bullets went. He testified that he had consumed three beers at the game, but he was not intoxicated at the time of the shooting. He also denied that the verbal exchange between him and Stakes was heated.
Dr. Michael Grieb, who was qualified as an expert in the field of emergency medicine, testified that he treated Gaines at Methodist Hospital on the night of the shooting. He testified that Gaines sustained a gunshot wound to his left arm, which missed his chest. Dr. Grieb testified that at the hospital Gaines told him he heard one shot.
Dr. John Hunt, III, qualified as an expert in surgery, testified that he treated Salvant at Charity Hospital on the night of the shooting. Dr. Hunt testified that Sal-vant sustained a “through and through” gunshot wound to his neck; no pellet was recovered. Det. Hunt testified that this wound also damaged Salvant’s spine, rendering him a quadriplegic.
Lloyd Goeloe testified that he worked as a deejay at the club on the night of the shooting. He stated that as he parked his car in front of the club to unload his | ^equipment, he saw Stakes talking with a few men. Goeloe testified that after depositing his equipment inside, he went back outside to move his car. He saw Ms. Lewis and Gaines, whom he greeted, and he continued to his car. He testified he heard the conversation between Gaines and Stakes, which escalated as he walked to his car. Goeloe testified that he could see that the conversation would not end well, and he walked up to Stakes to try to get him to go inside the club. Instead, Stakes continued arguing with Gaines. Goeloe stated that Stakes then said he was going to get his gun, and he went toward a nearby car. Goeloe testified he looked around for the security guard, but he did not see one; instead, he sent another worker inside to look for the guard. Goe- *683 loe stated that he followed Stukes to the car, bumping into him at one point, and he saw Stukes open the car door and remove a gun. Goeloe testified that he tried to dissuade Stukes from using the gun, but Stukes walked away from him. Goeloe testified that Stukes walked toward Gaines, pointed the gun at Gaines, and fired. Goeloe testified that the bullet hit Salvant and then hit Gaines. Goeloe testified that Salvant fell to the ground, and Stukes jumped back. Goeloe testified he went to Salvant to try to staunch his bleeding. Goeloe insisted he saw no one else shooting that night.
Marsha Thompson testified that she was working as a bartender at the club that night. She testified that at some point someone came into the club and told her that Bruce and Greg had been shot outside. At that point, Gaines walked inside, and Ms. Thompson could see that he was bleeding on the left side of his body. She took Gaines’ shirt off of his body and noticed the gunshot wound in his arm. She used his belt as a tourniquet on his arm and eventually went with him to Methodist Hospital. Ms. Thompson testified that she did not notice any weapons in Gaines’ | fipossession when she removed his shirt, nor did she find any weapons in her car after she had dropped him off at the hospital.
Ryan Lewis stated that he is Ms. Lewis’ brother and Salvant’s cousin. He testified that he, his brother, Gaines, and Salvant arrived at the club that night after leaving the Saints game. He stated that he and his brother went inside the club while Gaines remained outside. Lewis admitted that he and Gaines had been drinking at the game, but he indicated that Salvant only had one beer. Lewis testified that he heard two shots, and then Ms. Lewis came into the club and told him that Salvant had been shot. He testified he looked out the door and saw a man dressed in a white jumpsuit with blue trim (which the other witnesses testified Stukes was wearing). Lewis testified he walked outside, grabbed a stanchion from the parking lot, and threw it at the man in the jumpsuit, who was walking toward a car. Lewis testified he also picked up a traffic cone and threw it at the man. Lewis stated that as the man got on the other side of a truck, he raised his hand, which contained a gun. Lewis then ducked down, and the man got in a car and drove away. Lewis denied having any weapons that night.
James Lewis, IV testified that he, his brother Ryan, his cousin Salvant, and Gaines left the game and went to the club. He testified that he went inside once they arrived, and soon thereafter he heard two gunshots coming from outside. He testified he went outside and saw Salvant lying on the ground bleeding. He stated his brother Ryan then began throwing a traffic cone at a man in a white jumpsuit, and that man pointed a gun at Ryan. James testified that Ryan ducked down behind a car, and the man then tried to point the gun at Ryan over the top of the car. James stated that he caught the man’s attention, and the man then pointed the gun at him. James hid behind some people standing outside, and the man again |7pointed the gun at Ryan. James insisted he did not have a weapon that night, but he could not say if Gaines had one.
Det. Gregory Powell stated that he investigated the shootings. He testified officers seized one pellet and one spent casing outside Club 30 Something on Downman Road. He testified that from speaking with witnesses, he developed Stukes as a suspect in the shooting. Det. Powell stated that he later showed a photographic lineup to Salvant while Salvant was in the hospital, and Salvant chose Stukes’ photo as depicting the man who shot him. Det. *684 Powell stated that Salvant’s mother signed the back of the lineup for him because of Salvant’s paralysis. Det. Powell also showed Ms. Lewis a lineup from which she chose Stakes’ photo. Det. Powell testified that he learned that Stakes had surrendered at the Seventh District police station, and he met Stakes there and took his statement. Det. Powell testified that after being advised of his rights, Stakes stated that he was verbally playing with Ms. Lewis when two men became enraged. He testified they exchanged words, and the taller of the two men responded, ‘You can’t handle this.” The man then reached under his shirt. Stakes told Det. Powell that because he believed the man was reaching for a gun, he reached under his shirt, pulled his own gun, and fired at the taller man. At that moment, the shorter man moved and was hit by the bullet. Stakes then told Det. Powell that he threw the gun out the window of his car while driving over the high-rise bridge over the Industrial Canal, and he disposed of his clothing in Metairie. Det. Powell arrested Stakes for the shooting. He stated that although officers searched the area under the bridge where Stakes said he threw the gun, they were unable to find it. He also stated that Stakes told him that he threw away the gun and his clothing because he was scared.
|sOn cross-examination, Det. Powell estimated that he arrived at the scene of the shooting approximately seven minutes after it was reported to the police. He testified that both Lewis brothers stated they were inside the club when the shooting occurred, and they went outside and found their sister hysterical and their cousin shot. Det. Powell testified that the brothers told him that they saw Stakes get into a car and drive away. Det. Powell admitted that his report did not indicate that either brother told him that Stakes pointed a gun at them, but he insisted that one of the brothers told him this occurred, and he did not put this fact into the report. He also testified that Gaines told him that he heard only one shot. There was also some indication that Det. Powell testified at an earlier hearing that the Lewis brothers mentioned that they heard one shot. Det. Powell admitted that the officers found only one pellet and one casing at the scene.
Off. Keiondra Morgan testified that she responded to the call of the shooting and found two victims suffering from gunshot wounds. She testified that the officers seized one spent casing and one pellet, but they found no weapons. Off. Morgan testified that she interviewed Gaines while he was awaiting treatment at the hospital, and Gaines told her that he and Stakes became embroiled in a verbal altercation which led to the shooting. She testified that Gaines told her that Stakes fired one shot.
The State’s final witness was Bruce Sal-vant, Jr., who testified that he arrived at the club with Gaines and two Lewis brothers. He testified that he looked inside the club and then remained outside, calling Ms. Lewis to see if she would be joining them. Salvant stated that he was talking to someone else on his cell phone when he noticed Ms. Lewis walking up to the club. He testified that he saw Stakes, Ms. Lewis, and Gaines in a verbal confrontation, but he was not involved | ain the conversation. He testified that Stakes, whom he had never met before that night, was trying to get Ms. Lewis to come to him, but she refused to do so, and Gaines took exception to Stakes’ foul language. Sal-vant testified he walked up to Ms. Lewis and Gaines and attempted to get them inside the club. Salvant stated that as they walked to the door, he heard someone say: “Hand me the keys. I got something for them.” Salvant testified he looked *685 back and saw Stukes pointing a gun at him. Stukes then shot him. Salvant stated that he heard his cousin call out a license plate number, and his cousin stayed with him, trying to keep him awake while awaiting medical help. Salvant testified he later viewed a photographic lineup while in the hospital and positively identified Stukes as the man who shot him. On cross-examination, Salvant testified that he was standing between Stukes and Gaines when Stukes fired at him.
The defense presented various witnesses who were at the club on the night of the shooting. Joseph Alexander testified he was outside the club and saw Stukes arguing with another man who was standing by the door. Alexander stated that he saw the other man reach under his shirt, and he could see an object with a chrome handle under the man’s shirt. Alexander testified he believed the object was a gun, and he ran from the area. Although he did not see the shooting, he testified he heard one shot. He denied that anyone else spoke with Stukes during the argument. Alexander stated that he knew Stukes from working with him in the past.
Danielle Lumar was also standing outside the club just prior to the shooting. She stated that she saw two men, one of them Stukes, arguing. Although she did not know the content of the argument, she testified she heard Stukes shout, “if you’re going to shoot me, shoot me.” At that point, she saw the other man reach Imunder his shirt, and she saw a silver object under the man’s shirt. Ms. Lumar testified the man turned, and then she heard a shot. She then left the area. Ms. Lumar testified that she had never seen Stukes before that night.
Stella Knight testified that she was inside the club at the time of the shooting. She testified that right after the shooting a man hurried into the club and handed a silver gun to somebody standing by the door. She testified that she then left the bar, but these men remained inside the club. Ms. Knight admitted that she recognized Stukes, but she did not really know him.
Rene Stukes, the defendant’s wife, testified she was not at the club on the night of the shooting. She testified that her husband told her what happened at the club, but due to the State’s objection she did not specify what he told her.
Roman Colwart, who admitted he was some relation to Stukes, testified that he was present at the club several weeks prior to the shooting. Colwart stated that on that occasion, Stukes was forcibly removed from the club after having an altercation with a group of people when Stukes was accused of touching someone. Col-wart testified that Gaines was one of the people with whom Stukes had been arguing. Colwart testified that after Stukes was ejected from the club, someone told him: “Do you know where you’re at, you’re in front of Club Thirty [Sjomething. You’ll get killed out here.”
Colwart stated that he was not present on the night of the shooting, but soon thereafter Stukes called to tell him that he had shot someone at the club who had pulled a gun on him. Colwart then drove Stukes to the police station where Stukes surrendered.
Romallis Stukes maintained that he did not intend to harm Salvant or Gaines and that he merely fired in self-defense. He testified that a few weeks prior to the Inshooting, he was at Club 30 Something when a group of people, which included Gaines, accused him of touching people in the group. Stukes stated that the group removed him from the club, despite his protests of innocence, and people standing outside the club warned him they would *686 kill him. He testified that Colwart, who was also there, convinced him just to leave the club. He testified his cousin Lamont was also present, but by the time of trial Lamont was deceased.
Stukes testified that on the night of the shooting he was standing outside the club with Lamont when Ms. Lewis passed them on her way into the club. Stukes stated that he was acquainted with Ms. Lewis because he and his wife frequented the bar where she worked. Stukes testified that as Ms. Lewis passed him, he said hello, but she just ignored him. He then playfully called her “Big Head,” but she continued to ignore him. She walked over to Gaines, who was standing by the door, and he called to Gaines to get Ms. Lewis’ attention. Gaines refused, indicating that Stukes had “disrespected” her. They argued about this, and then Ms. Lewis opened the door to go into the club. Stukes stated that Gaines then warned him that they were going to kill him. Stukes testified that he responded that if Gaines was going to shoot him, he should just do so, and he opened his arms. At that point, Gaines turned and reached under his shirt to show Stukes his gun. Stukes testified he drew his own gun and shot at Gaines. He then jumped to the side of a van, and when he looked back at the club, he did not see Gaines but instead a man came running out of the club and threw a traffic cone at him. Stukes insisted he only fired his gun once, and he denied exchanging any words with Salvant. Stukes testified that he got into his car and drove from the club. He testified he panicked and threw his gun out of the window of his car as he crossed the Industrial Canal. He testified he changed his clothes and disposed of them [ 12somewhere in Metairie. He then called his wife and his cousin, and the cousin took him to the police station where he surrendered. Stukes insisted that he only fired in self-defense because he believed Gaines was going to shoot him. He also testified that a civil suit was pending against him in connection with the shooting.
On cross-examination, Stukes denied calling Ms. Lewis obscene names. He also denied that Mr. Geoloe tried to intervene in the argument. He denied going to his car to get his gun, maintaining that he was carrying the gun at the time. He insisted that Gaines was carrying a gun at the time he shot at Gaines. He admitted, however, that no one returned his fire.
On rebuttal, the State called Antoine Dupre, who testified he is a close family friend of Salvant, and he knows Gaines. Dupre testified that that a few weeks prior to the shooting, he was with a group of men and women at the club. As they exited the club, Stukes approached the group and made improper remarks to one of the women. A man in the group took exception, and Stukes and the man argued. The argument became heated, and Dupre had to separate Stukes and Dupre’s friend. Dupre testified that Stukes tried to continue the argument, and again Dupre separated the two. Dupre denied that Gaines was present that night, and he further denied that anyone in the group threatened Stukes. He testified that other than him, the rest of the group was not connected to Salvant. He also testified that although there were two security guards present that night, neither became involved in the incident.

DISCUSSION

The defendant alleged nine grounds in his motion for new trial. The court granted relief on six grounds: (1) the defendant was unable to present his defense 113completely and properly because the court did not allow his wife to testify about his actions directly after the shooting occurred (ground three); (2) and (3) the *687 State engaged in improper argument and the court erred by denying the defendant’s motion for mistrial based upon this argument (grounds four and five); (4) the trial court erred by refusing to instruct the jury regarding negligence (ground six); (5) a State’s witness engaged in inappropriate jury contact, which denied the defendant a fair trial (ground seven), and (6) the cumulative effect of multiple errors denied the defendant a fair trial (ground eight).[1] The State now argues that the trial court erred in granting the defendant a new trial as none of these grounds entitles him to a new trial.
I.
With respect to the first ground, the defendant’s wife was not present at the scene of the shooting. At trial defense counsel called her to the stand and attempted to elicit testimony concerning how she found out about the shooting. The State objected, and a bench conference occurred. After the conference, defense counsel merely asked her whether she became aware of the shooting, to which she replied affirmatively. Defense counsel then tendered her to the State, which had no questions. The court recessed the trial for lunch, and outside of the jury’s presence defense counsel noted that he was “interested in inquiring as to the circumstances involving what [Mrs. Stakes] was aware of and how she was aware of it post the actual shooting incident.” Counsel noted that he had intended to ask her questions concerning “how she found out about the shooting. In fact, she found out from her husband, what her husband related to her, things of that | Unature.” Counsel reiterated that the court had sustained the State’s objection to this line of questioning, and he noted his objection to the court’s ruling.
In his motion for new trial, the defendant argued that he needed to present his wife’s testimony to show his actions after the shooting and before he surrendered to the police. He indicated that he needed to present this evidence to counteract what he knew would be included in the State’s closing argument, questions about why he disposed of the gun and his clothing before surrendering. He contended that he needed his wife’s testimony, including what he told her about the shooting, in order to support his self-defense assertion.
The State now argues that the trial court erred in granting the new trial on this basis because this testimony would have at best been cumulative to testimony given by Det. Powell and the defendant himself concerning what actions the defendant took after the shooting and why he threw away his clothing and the gun used in the shooting. As such, the State contends, the defendant was not improperly denied his right to present a defense.
In State v. Van Winkle, 94-0947, pp. 5-6 (La.6/30/95), 658 So.2d 198, 201-202, the Court discussed a defendant’s right to present a defense:
A criminal defendant has the constitutional right to present a defense. U.S. Const. amend. 6; La. Const. Art. 1 § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Gremillion, 542 So.2d 1074 (La. 1989); State v. Vigee, 518 So.2d 501 (La.1988). Due process affords the defendant the right of full confrontation and cross examination of the State’s witnesses. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 *688 (1973); State v. Mosby, 595 So.2d 1135 (La.1992). It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
Evidentiary rules may not supersede the fundamental right to present a defense. In State v. Gremillion, supra, the defendant attempted to introduce |1Bevidence that third parties, rather than the defendant, had killed the victim. The evidence consisted of a statement that the victim had made to a sheriffs deputy who investigated the crime. The statement was that he had been attacked and beaten by three white males. The trial court and the Court of Appeal both held the statement was inadmissible hearsay. We agreed that the statement was hearsay and that it did not meet any applicable exception (res gestae, dying declaration, business records). However, we concluded that normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant’s right to present a defense. See Chambers v. Mississippi, 410 U.S. at 302, 93 S.Ct. at 1049. Exclusion of the statement in Gremil-lion impermissibly impaired the defendant’s fundamental right. 542 So.2d at 1079, citing State v. Washington, 386 So.2d 1368 (La.1980).
Similarly, in State v. Vigee, supra, we held that hearsay evidence supporting the defendant’s theory of the case and undermining the State’s lead witnesses was relevant; excluding it mandated reversal. The defendant may always assert that someone else committed the crime. Chambers v. Mississippi, supra; State v. Ludwig, 423 So.2d 1073 (La. 1982).
In Van Winkle, the defendant’s son was found suffocated in his bedroom, and the defendant was arrested for his murder. The defense theory was that a man who lived in the apartment was a homosexual hustler who brought home another man, and these two men accidentally killed the boy during forced attempted homosexual activity. In furtherance of this theory, the defendant sought to question: (1) the roommate about his sexual activities and source of income; (2) the coroner about the condition of the victim’s anal orifice; (3) the State’s chemist as to why the absence of sperm in the anal swabs containing seminal fluid did not necessarily disprove sexual activity; (4) the bartender of the bar where the roommate hung out as to what he meant by the bar being a “hustler” bar; and (5) another bartender of the bar as to whether the bar was a gay bar. The district court refused to allow |1ficounseI to question the witnesses as to these areas, and the defendant was convicted of her son’s murder. The court of appeal affirmed her conviction. On review, the Court reversed, finding the trial court’s ruling prevented the defendant from presenting a defense. The Court found that the evidence that the court refused to admit was relevant to the issue of whether someone else may have committed the murder. The Court stated: “By abridging the cross examination of these witnesses, the trial court impaired [the defendant’s] constitutional right to present a defense.” Id. at 7, 658 So.2d at 202. The Court further held that this error was not harmless because it found a reasonable possibility that the excluded evidence might have contributed to the verdict. The case against the defendant was based upon circumstantial evidence, and the defense theory (that the roommate and another man who was seen leaving the apartment early on the morning of the murder committed the murder) may well have given the jurors reasonable doubt of the defendant’s guilt. The Court reversed *689 the conviction and remanded for a new trial.
In State v. Juniors, 2003-2425 (La.6/29/05), 915 So.2d 291, the defendant was charged with killing one man and wounding another at a business. His co-defendant, who formerly worked at the business, pled guilty in exchange for his testimony against the defendant. The defendant sought to introduce three items to impeach his codefendant’s credibility: (1) the portion of the hospital record of the deceased victim which stated the victim had been shot by a “disgruntled employee;” (2) the results of his codefendant’s drug test taken in connection with his employment with the business; and (3) a letter purportedly written by the codefen-dant in which he indicated he would testify that neither of them had anything to do with the murder. The trial court refused to allow the |17defendant to introduce any of these items. On appeal, the Court upheld the rulings as to the first two items. With respect to the first item, the victim never regained consciousness; thus the statement as to who shot him was from an unknown declarant and as such double hearsay and inadmissible, even if the rest of the hospital record was admissible. As to the second item, the report was not prepared by the business, but rather by another company that administered the test, and the defendant did not call the person who was the custodian of that record. In addition, the Court noted that the defendant was able to introduce the code-fendant’s employment records, which included his pink slip. Also, the Court noted that the defendant could have elicited testimony concerning the reason for the termination of the codefendant’s employment, but he failed to do so. Finally, with respect to the letter purportedly handwritten by the codefendant, the Court found that the trial court erred by refusing to allow its introduction because it could have been used to impeach the codefendant. Nonetheless, the Court found the error to be harmless in light of the facts that the defendant’s fingerprints were found at the scene, his gun matched a bullet found at the scene, and another witness testified that she saw a car with two men parked at the post office lot just prior to the murder, corroborating the codefendant’s testimony that he waited in the car at the post office while the defendant committed the crime.
In State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675, the defendant was charged with the rape and murder of a twelve-year-old girl. A man who lived across the street from the scene of the crime implicated the defendant. The trial court refused to allow the defendant to introduce evidence of the man’s history of violent criminal behavior and the fact that the man killed himself after murdering his baby and the baby’s mother in order to show that man could have committed 11Rthe crime. The Court upheld the trial court’s ruling, noting that the man’s prior crimes were not similar to the present one and that the defendant was able to show that the man made obscene phone calls to the victim’s mother. In addition, the defendant was able to question police officers about their failure to investigate the man, even though he lied to the police, gave them false leads, and was seen with the defendant on the night of the murder, although there was no evidence to tie him to the crime scene.
In State v. Vigee, 518 So.2d 501 (La.1988), the State presented evidence that police officers observed a drug transaction involving two pedestrians and a seller in a car. As the officers approached the car, the pedestrians fled. The officer who stopped the car testified that he saw the driver, the defendant, reach behind him. Fearing the defendant was reaching for a gun, seeing the dome light in the car go *690 on, and hearing the car accelerate, the officer drew his gun. He stated that when the car lurched forward, it hit him and his gun discharged, striking the defendant. The officers subsequently seized several packages of heroin from the car. By contrast, the defendant testified the car had just been purchased by a friend, and he was taking the car for a test drive when the officers stopped him. He testified that the friend directed him to stop at a certain corner, and when he did so someone approached him from behind and put a gun to his head. He testified that when he leaned to the side to avoid the gun, the gun fired, striking him. He testified he had left the car in drive, and when he was shot the car sprang forward. He contended that the car had previously belonged to a known drug dealer, and he theorized that was why the officers approached him with their guns drawn. The trial court denied his effort to introduce evidence that at the time of the offense the car belonged to a known drug dealer, as well as evidence that his friend tried to get |T (¡someone to lie to give the friend an alibi. On appeal, the Court found that the trial court erred by refusing to admit this evidence. In addition, the Court found that this error was not harmless, given the fact that the jury returned a lesser included verdict of simple possession of heroin, apparently disbelieving the officers’ testimony that they saw a drug transaction.
In State v. Short, 94-0233 (La.App. 4 Cir. 5/16/95), 655 So.2d 790, the defendant was charged with the aggravated rape of his stepdaughter. He wanted to present evidence to show: (1) that his wife was having an affair and was spending his paychecks while he was offshore; (2) that the victim liked the new boyfriend better than she liked him; and (3) that several other men, including the new boyfriend, had access to the victim. The defense was not allowed to delve into these matters, and the defendant was convicted. On appeal, this court rejected his claim that he was denied the right to present a defense. The court noted the defendant was allowed to question the victim concerning her bias against him, including her wish that the defendant and her mother were not married and her wish to live elsewhere. In addition, the defendant was allowed to testify that the victim had made a similar accusation against her mother’s former husband, and he was allowed to establish the existence of her mother’s boyfriend at the time of the alleged rape.
In State v. Judge, 99-1109 (La.App. 3 Cir. 3/1/00), 758 So.2d 313, the defendant was accused of sexual battery. The trial court refused to allow the defense to present evidence that the victim had told a police officer that she had been raped a few years earlier, but she had not reported the crime. The defendant proffered the victim’s testimony, wherein she testified an ex-boyfriend had raped her a few years earlier, but she did not tell anyone until much later that it had [2nhappened. On appeal, the defendant contended the trial court erred by not allowing this evidence to be presented to the jury. The appellate court found no error.[2]
Here, it is unclear exactly what testimony the defendant’s wife would have given if allowed to testify because the defendant did not proffer her proposed testimony, either at trial or before the court ruled on the motion for new trial. The State acknowledges that the defendant *691 sought this testimony to show the reasons for his actions after the shooting, specifically his disposal of his clothing and his gun. The State notes, however, that other witnesses, including the defendant himself, testified as to the reasons for his actions. Det. Powell testified that the defendant told him he fired at Gaines because he thought Gaines was reaching under his shirt for a gun, and he further told Det. Powell that he threw away the gun and his clothing because he was scared. The defendant himself testified that prior to the shooting Gaines threatened him, and he pulled his gun and shot at Gaines after seeing Gaines reach under his shirt. He further testified that he panicked after the shooting and disposed of his gun and clothing. He then called his wife and cousin, and his cousin took him to police station where he surrendered. Thus, if the reason for calling the defendant’s wife to the stand was merely to testify as to what he told her about the shooting, it is quite likely that her testimony would merely be cumulative to the defendant’s testimony as to the events leading up to the shooting and its aftermath, as well as Det. Powell’s testimony about what the defendant told him in his statement to the police. As such, the court’s refusal to allow the defendant’s wife to testify as to what the defendant told her about the shooting and his actions after the shooting did not 12iunduly impinge on his right to present a defense, and the trial court erred by granting a new trial on this basis. The State’s claim has merit.
II. & III.
In his next two claims, the defendant contends that he was entitled to a new trial because the trial court refused to grant his motion for mistrial due to what he termed improper argument by the State, which repeatedly referred to public sentiment. The court granted relief on these claims, finding that these errors deprived the defendant of a fair trial. The State now argues that the court erred by so finding.
In State v. Clark, 2001-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183, this court set forth the standard for determining whether a prosecutor’s remarks are so prejudicial as to warrant a new trial:
The scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to “smoke screen” tactics and defense as “commie pinkos” were deemed inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even where the prosecutor’s statements are improper, credit should be accorded to the good sense and fairmindedness of *692 the jurors who have heard the evidence. Williams, supra; Ricard; supra.
In Clark, the prosecutor referred to the amount of drugs with which the defendant was charged with possessing as representing two thousand needles sticking out of the defendant’s arm. In addition, in rebuttal to the defense argument that some of the police officers involved in the case were dishonest, the prosecutor responded that if not for the officers, drugs would come “pouring” into the city’s streets. The prosecutor then informed the jury that this was its chance to say no, that this is not acceptable and that drug sales “will not go on in my city, in my community, in my schools.” On review of the defendant’s conviction and sentence, this court found that these statements, even if going beyond the scope of closing argument and even if improper, did not contribute to the verdict, and thus the defendant was not entitled to a new trial.
Likewise, in State v. Harry, 2001-2336 (La.App. 4 Cir. 6/26/02), 823 So.2d 987, the prosecutor referred to the defendant as someone who might approach the juror’s children or someone they cared about and try to sell them drugs. This court found that these statement, although improper, did not contribute to the verdict, and thus the defendant was not entitled to a new trial.
In State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, the prosecutor reminded the jurors that they lived in a state where the death penalty could be imposed and that they had indicated they believed in its application. The prosecutor stated that he believed this case was appropriate for its imposition:
[Tjhen I say this is the case, this is the day where you give your answer to this. You say, no. You say I am not going to tolerate it. I am not going to find it mitigating. 11 a3am not going to excuse it. I am not going to do anything but give you a message, do not do this. We’re not impotent. We’re not helpless in a society ... This family will wait on your verdict. I will wait on your verdict.
Id. at p. 14, 708 So.2d at 716. On appeal, the Court found that these comments did not necessarily contribute to the verdict and did not “degenerate into a plebecite on crime.” Id. at p. 15, 708 So.2d at 716.
In the cases cited by the defendant in his motion for new trial, the courts may have found the comments to be improper, but they also found any error resulting from them harmless. In State v. Deboue, 552 So.2d 355 (La.1989), the prosecutor stated that the “community is waiting for you to tell them what to do” and told the jurors that the defendants would merely laugh if given life sentences. The Court found these statements to be improper but harmless. Likewise, in State v. Johnson, 00-0680 (La.App. 1 Cir 12/22/00), 775 So.2d 670, the court found improper but harmless the prosecutor’s exhortation to the jury to “do the right thing” as citizens of Baton Rouge. In State v. Mims, 97-1500 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, this court refused to grant the defendants a new trial where the prosecutor referred to the defendants as purveyors of drugs and “merchants of death.” The Court in State v. Sugar, 408 So.2d 1329 (La.1982) noted that the prosecutor’s comments that the jury could not “let this happen in the community” and similar comments “flirted with reversible error,” but the Court reversed the defendant’s conviction on other grounds.[3]
*693 1 j^Here, the actual statements made by the prosecutor are unknown because they were not transcribed. Nor were they recounted in his motion for new trial. After the jury retired, defense counsel stated:
The cases are legion on the point, you cannot appeal to community sentiment and/or frustration over crime as a basis for returning a verdict. The cases are overwhelming on the particular point. You made not one, not two, not three, not four, not five, not six, I counted at least eight separate references to, “If you’re tired of crime in your area and if you’re tired of people dong this, then send a message.” You cannot argue community sentiment in a closing argument as a prosecutor, it is absolutely black letter. I am so sorry to have to do this.
The prosecutor replied that her statements reflected only her sentiments on the matter, not an appeal to community sentiment. She insisted that her argument was limited to the facts of the case. The court agreed and denied the motion for mistrial.
If, indeed, the statements noted by defense counsel in the transcript were the extent of the prosecutor’s statements, they are much less inflammatory than those quoted above in Williams, which the court found not to rise to the level of a plebecite on crime. In addition, even they were improper, it is difficult to see how these statements contributed to the verdict given the fact that jury came back with lesser included verdicts of aggravated battery. Therefore, we find the trial court erred by granting a new trial on this basis, and the State’s claim has merit.
TV.
The next ground upon which the trial court granted relief was the defendant’s claim that the trial court erred by refusing to instruct the jury on the issue of criminal negligence to allow the jury to find that he did not intend to kill bKor inflict great bodily harm on the victims.[4] In his motion, he alleged that the principal issue in the case was his intent to kill or harm the victims, and his defense was that he did not intend to kill or hurt either victim. In this application the State argues that because negligent homicide is not responsive to attempted second degree murder, with which the defendant was charged, the trial court could not properly charge the jury on this crime. In addition, the State notes that the defense presented would not support a finding by the jury that the defendant shot the victims negligently; rather, the defense was that the defendant shot them in self-defense.
A trial court must instruct the jury as to the law applicable to responsive verdicts. La.C.Cr.P. art. 803. La C.Cr.P. art 814(A)(4) sets forth the responsive verdicts for attempted second degree murder as guilty, guilty of attempted manslaughter, guilty of aggravated battery, or not guilty. Negligent homicide is not a statutorily recognized responsive verdict to a charge of attempted second degree murder. However, La.C.Cr.P. art. 802 mandates that the trial court instruct the jury as to the law applicable to each case. This rule has been interpreted as requiring the trial court to charge the jury, when properly requested, as to the law applicable to any theory of defense that the jurors could reasonably infer from the evidence.[5] State v. Robert Jackson, 450 So.2d 621, 632 (La. *694 1984); State v. Raynell Jackson, 97-2220 (La.App. 4 Cir. 5/12/00), 733 So.2d 736; State v. Patterson, 99-994 (La.App. 5 Cir. 1/25/00), 752 So.2d 280. In Robert Jackson, the Court held that in a first-degree murder prosecution the trial court did not err in refusing to give the defendant’s requested instruction concerning negligent | ¡^homicide because that offense was not fairly supported by the evidence — the defendant strangled the victim. In Patterson, the court found no error in the trial court’s refusal, in a second-degree murder prosecution, to give a requested charge on negligent homicide where there was no evidence from which the jury could have inferred guilt of that lesser offense. The victim died in the hospital after he was severely beaten by the defendant outside of a bar.
In State v. Hardy, 97-1218 (La.App. 3 Cir. 3/6/98), 711 So.2d 715, the court properly denied a similar request; the defendant shot the victim while the victim was sitting inside a car. Likewise, in State v. Jasper, 28,187 (La.App. 2 Cir. 6/26/96), 677 So.2d 553, the defendant’s cousin had been killed by the intended victim, and when the defendant learned that the intended victim had been released from jail and was in the area, the defendant armed himself and sought out his cousin’s killer. The two men argued but were pulled away by various friends, and the intended victim entered a car and drove away. The car passed back by the defendant and his friends, and they opened fire on the car. The occupants of the car were unhurt, but a bystander who was sitting on his porch was caught in the crossfire and died of his wounds. The trial court refused the defendant’s motion to have the court instruct the jury on negligent homicide, and the appellate court affirmed this ruling, finding that the evidence adduced at trial would not have supported a finding that the shooting was negligent.
Here, defense counsel stated that he had planned and presented his defense based upon his assumption that the instruction would be given. However, a reading of the transcript indicates the defense was not that the gun accidentally discharged, but rather that he shot at Gaines and hit Salvant and Gaines when he saw Gaines reach under his shirt. Thus, the defense presented was self-defense, | s>7not an accident, and as such there was no basis for the criminal negligence instruction. Therefore, the trial court erred in granting a new trial on this basis as well. The State’s claim has merit.
V.
In his next claim, the defendant argues that he was entitled to a new trial because of what he termed “inappropriate contact” between members of Salvant’s family and the jury while the parties were in conference in chambers. It appears that this “contact” consisted of a medical procedure that was performed on Salvant by members of his family in the courtroom, in the jurors’ presence, while the parties were in the judge’s chambers. Apparently, the procedure was a pressure release, which a very quick search on the Internet revealed to be connected with the release of pressure in the airways. Out of the jury’s presence, the court questioned its law clerk, who was present in court and described the procedure: He bent over and there were about three or four people standing up around him and they had him held over and there were three or four family members or friends, something around him and they were fixing something down his back. And then they were helping him to sit up and fixing him just a few feet away from the jury.
The law clerk estimated the procedure lasted about two minutes, and she testified *695 that most but not all of the jurors watched the procedure. She also testified that she could not hear any “conversation or anything that transpired in the course of that event.” On examination by defense counsel, the law clerk stated that she brought the event to the court’s attention “[b]e-cause I’m aware and I’ve been trained in law school about sympathy in jury instructions.” The prosecutor indicated she did not see the procedure, but she was aware that the victim needed to have the procedure performed at certain intervals, and apparently several people 1 ?«were huddled around the victim while the procedure was being performed. Defense counsel responded that he wanted the procedure to be considered in connection with what he described as “oohing and aahing” that occurred during the testimony of a State’s witness and crying by Salvant’s mother during closing argument. The prosecutor pointed out that only one person sighed during testimony, and it was normal for the victim’s mother to sob quietly during argument. The Court then noted that “whatever emotion besides the ooh as described by [defense counsel], whatever other crying, sobbing, weeping was not ultimately audible to the Court. Granted the Court was not the same position vis-a-vis the witnesses as the trier of fact.” The court then denied the motion for mistrial.
In his motion for new trial, the defendant merely alleged that this procedure was an improper contact between the Sal-vant family and the jury, an attempt to display Salvant’s injuries. In its judgment, the court agreed. The State now argues that the trial court erred by so ruling. The State argues that because Salvant was a victim, he was entitled to be in the courtroom. See La. C.E. art. 615B(4). The State points out that nonetheless Salvant remained outside the courtroom during most of the trial because he had to have this procedure performed periodically, and it was not until closing arguments began that he remained in the courtroom. The State argues that the procedure was a medical necessity, not a ploy for sympathy.
From a reading of the trial transcript, it is apparent that the need for the procedure was real, not just a ploy for sympathy. Indeed, the defense did not argue that Salvant did not need the procedure to be performed. From the description given by the law clerk, it does not appear that the actions taken were of such a graphic nature as to cause any more sympathy than the jurors may have felt based | ¡.gupon merely observing the paralyzed victim and hearing his testimony. Tellingly, the defense did not seek to question any of the jurors, either at trial or at a later hearing, to see if they were influenced by the performance of this procedure in their presence. Thus, the mere allegation that this procedure was an improper contact with the jury did not entitle the defendant to a new trial, and the trial court erred by granting a new trial on this basis. This claim by the State also has merit.
VI.
The last ground upon which the court granted relief was the allegation that the cumulative effect of the other errors was so prejudicial that the defendant was denied a fair trial. However, because there was no merit to the other claims, there was no cumulative effect that denied him a fair trial. The court erred by granting relief on this ground, and this claim by the State also has merit.

CONCLUSION

The grounds upon which the trial court granted the new trial are without merit. Accordingly, we grant this writ, reverse the trial court’s ruling, reinstate the jury’s *696 verdicts, and remand the case for sentencing.
WRIT GRANTED; REMANDED FOR SENTENCING.
LOMBARD, J., dissents.

. The grounds upon which the court denied relief were: (grounds one and two) the court erred by denying the defense the option of ''back-striking” jurors during voir dire; and (ground nine) the verdicts were contrary to the law and evidence.

. See also State v. Washington, 99-1111 (La. App. 4 Cir. 3/21/01), 788 So.2d 477, where this court found that the trial court did not err in granting a motion in limine prohibiting the defense from questioning the arresting officer about allegations made in a newspaper article concerning misconduct by the officer for which he had not been charged.

. The cite for the other case cited by the defendant, a Third Circuit case named State v. Williams, is incorrect, and it is unclear what that case held.

. Although the State refers to an instruction on negligent homicide, the transcript reveals that defense counsel sought an instruction on criminal negligence.

. See La.C.Cr.P. art. 807 (requested special written charge shall be given “if it is ... pertinent”).