|,WALTZER, Judge.
STATEMENT OF THE CASE
On 28 November 1996, the Orleans Parish Grand Jury indicted Michael Williams, along with his sister, Betty Lawrence, and her son, Alvin Lawrence, on a charge of second degree murder of Richard Duskin, a violation of La.R.S. 14:30.1 Williams, through retained counsel, entered a plea of not guilty on 24 February 1997. On 13 April, trial was held before a twelve person jury. The State’s motion to sever Williams’ co-defendants was granted. Following a two day trial, the jury returned a verdict, finding Williams guilty of manslaughter. On 26 May 1998, the trial court sentenced Williams to twenty years at hard labor, with credit for time served from date of arrest. The State filed a multiple bill of information, citing his prior conviction on a guilty plea to a charge of possession with intent to distribute crack cocaine, to which Williams pled not guilty. On 25 June 1998, Williams and the State submitted the multiple offender issue following a hearing to the trial court who found Williams guilty as a second offender. Williams, through counsel, waived all legal delays and requested immediate sentencing. The trial court set |?aside the sentence of 26 May 1998 and imposed a sentence of thirty, years at hard labor with credit for time served and waived costs. The State nolle prosequied the indictments *581 of Williams’ co-defendants on 10 September 1998.
On 6 July 1998 the trial court granted Williams’ motion for an appeal. On 7 August 1998, the defense filed a copy of its motion to remand, filed with this Court. On 27 August 2998, Williams filed a motion in arrest of judgment or in the alternative for new trial. On 4 September 1998, the trial court declared the motion for new trial to be moot and on 10 September 1998 appointed the Louisiana Appellate Project to represent Williams on appeal. On 2 February 1999, the trial court denied Williams’ motion for an appeal bond and on 17 May 1999 denied his motion for production of documents.
STATEMENT OF FACTS
Dr. Paul McGarry, forensic pathologist for the Orleans Parish Coroner’s Office, was accepted by the parties and the trial court as an expert in forensic pathology. He identified the report of his autopsy of ■ Richard Duskin, performed on 29 November 1996. Duskin suffered two gunshot wounds, one to the chest and one to the thigh. He retrieved a .25 inch bullet from the victim’s thigh. Dr. McGarry also found fresh abrasions to the left shoulder and elbow, both knees, shin, tip of right index finger and back of left middle finger. The abrasions were the sort of injury likely to occur when a person falls on pavement. The bullet to the victim’s chest pierced the seventh rib, traveled across the chest, through both lalungs, opening up the major arteries to both lungs, came out the right side through the fourth rib and caused both lungs to fill with blood, forcing blood in the victim’s bronchial tubes, windpipe, larynx and nose and mouth, causing him to breathe his own blood. According to Dr. McGarry, this wound would cause the victim to die within a few minutes, during which he could have crawled on the sidewalk, throwing up blood, gotten into his car, swerved to the corner and made two right-hand turns, continuing until the car crashed. This chest wound was the cause of the victim’s death.
The victim’s mother, Gayle Duskin, testified that she is a professor of English Literature and of Classical Rhetoric at Dillard University. Her husband and son worked on the river as longshoremen. She last saw her son at 10 a.m. on the morning of 28 November 1996. Subsequent to a phone call her daughter received, the mother and her daughter went to the home of the victim’s girlfriend. The victim’s father had preceded them to the house. She arrived at the scene and learned from the police that her son was dead in his car. Eventually, the family gave the car away because of its tragic associations.
NOPD Officer Joseph Tafaro, a forensic scientist working in the NOPD crime lab, testified that he is one of the laboratory serologists, who type blood and examine blood and body fluids. He was accepted as an expert in his field. He examined blood samples from a white towel and a blue hard hat, and identified them as Type A human blood.
|4NOPD Crime Lab Officer Tarez Smith testified that he took photographs of the crime lab and took blood samples. He identified photographs of the spent casings and other photographs of the crime scene. He also identified a blood-stained blue hard hat and white towel that he had recovered from the scene, 4817 America Street. He testified that he sealed the evidence and turned it over to Central Evidence and Property where it remains under seal.
NOPD Detective Byron Adams of the Seventh District testified that he was assigned to the Duskin homicide investigation. On 28 November 1996, at about 3 p.m., upon arriving at the crime scene he interviewed the district officers who were present. He testified to his examination of the evidence. He developed suspects from his interview with Evangeline Hall, who lives across the street from the house where the shooting occurred. The detective also spoke to Stella McDonald, the *582 victim’s former girlfriend. Hall and McDonald identified a photograph of Williams.
The police witnesses established that no weapons or related paraphernalia were recovered from the victim’s vehicle. Mrs. Duskin testified that she found no gun in the car when it was returned to her.
NOPD crime lab firearms examiner Officer Kenneth Leary testified as an expert in firearms examination identification. He testified that all three shell casings found at the crime scene were fired by one .25 caliber semi-automatic pistol. He examined the bullet that had been fired into the victim’s car, but it was |Btoo damaged for identification. Both that bullet and the one recovered from the victim’s body during the autopsy came from a .25 caliber semi-automatic pistol.
The victim’s neighbor, Evangeline Hall, testified for the State. She identified Mary McDonald, her daughter, Mary, Stella McDonald, and Betty Lawrence as neighbors across the street. She identified Williams as Betty’s brother. She then identified Alvin and Calvin Lawrence, Betty’s sons and Williams’ nephews. She testified that on the afternoon of the crime, she was talking to her boyfriend on the telephone, sitting by an open window facing Mary’s house across the street when she heard an ongoing argument outside. The argument, which lasted from 15 to 20 minutes, was coming from across the street. Ms. Hall went to the door and saw Betty, Stella, Mary and the victim, arguing. She saw Williams walk up the sidewalk, pointing and aiming a gun at the victim. Betty ran to him and told him not to shoot. He continued to aim the gun at the victim. The women ran to Williams, trying to make him stop. Williams then hit the victim with his gun and they began to fight. Mary and Stella ran inside, leaving Betty outside. The victim was wearing his hard hat. During the fight, it fell off and Williams picked it up, hit the victim with the hat and threw it to the ground. The victim fell to the ground and, as he was on his knees, Betty hit him on the back of his head with a beer bottle. Her son, one of the twins (Alvin and Calvin) came through the field next door and starting shooting at the victim, who fell onto his stomach. After Williams saw his nephew shoot the victim, he shot the victim twice. The victim got up, stumbled to his car, throwing up blood. While his legs |fiwere still out of the car, Betty started slamming his legs in the car door. Her son came around the car and started shooting into the car on the driver’s side. The victim drove off, swerving up the street. As he turned, Ms. Hall heard several shots.
She spoke to police the next day. On cross-examination, despite intensive questioning by counsel, Hall denied that the victim had a gun or hit Betty with a gun. Ms. Hall denied defense counsel’s suggestion that she had been paid $3,000 to lie in the case.
Shantelle Harris was called by the defense. She testified that she “was going with” Mary McDonald’s grandson and Stella McDonald’s son, Calvin. During the course of her acquaintance with the Mc-Donalds, she had witnessed several altercations between Stella McDonald and the victim. Despite the altercations, Stella and the victim “were still dating” aL the time of the shooting, according to Ms. Harris. On the afternoon of 28 November, Ms. Harris testified that she, Betty, Stella and Mary McDonald and Mary Taylor were sitting on the porch at 4817 America Street, home of Mary McDonald and Betty Lawrence, talking. The victim had been sitting outside a house in the next block drinking liquor. He then drove to the home and tried to get Stella to talk to him. He became verbally abusive, drove off and returned within five or ten minutes, repeating his verbal abuse. He then argued with Betty, whereupon her brother, Williams, came walking down the street and paused to speak to the group. Williams and the victim began to argue, and ultimately the victim struck Williams, *583 and Williams hit the |7victim, who fell to the ground because, according to the witness, he was drunk. She then saw the victim get into his car and take a gun from under the seat. Williams was walking away as Betty tried to keep the victim from leaving his car with his gun. The victim then struck Betty in the head with the gun. The victim drove off, firing his gun at Betty’s sister’s home on Prentiss Street. He turned into Dale Street and ran into a fence. Harris testified that the victim’s father and brother drove to the victim’s car, went in the car and “fiddled around” with the car, then drove away. They returned after the police had arrived. She denied having refused to give a statement to the police.
On cross-examination, she admitted having seen Betty strike the victim with a beer bottle, but claimed she did so in self-defense.
Defense counsel sought to elicit from Harris information about the relationship between Stella and the victim. She was allowed to testify that she was aware of several arguments between the two, but the trial court did not allow her to elaborate absent any specificity as to time and place that would demonstrate relevancy to the shooting. The trial judge sustained objections to the following questions in particular:
‘Would you please tell us about some of [the altercations you- saw between Stella and the victim]?”
“Had they had any altercations between them that caused either one of them to get arrested?”
“Had Richard Duskin been arrested for doing Stella McDonald anything?”
| R“Anything in particular you remember about [the victim]?”
“Did you know Richard Duskin to be a violent individual?”
Officer Adams testified that he did not take a formal, verbatim statement from Ms. Harris because she refused to come to the police station to make a full statement and her interview was inconsistent with the crime scene evidence, with what the other witnesses had told police and with the condition of the victim. The Officer’s notes of his oral interrogation of Ms. Harris concluded, “Shantelle Harris added she did not know how [victim] got shot. Because he was the only person she saw that was armed.” She said nothing about the shooting that took place in front of Betty’s home, about the victim bleeding on the sidewalk or in the street, about shell casings, the beer bottle incident, or the blue hard hat. The officer found no physical evidence to corroborate Ms. Harris’ statements. He found evidence to corroborate Ms. Hall’s subsequent statement. Furthermore, neither Stella nor Mary McDonald said the victim was armed.
ERROR PATENT REVIEW
A complete review of the record reveals no error patent.
FIRST ASSIGNMENT OF ERROR: The trial court erred in excluding evidence of the victim’s reputation and pri- or acts of domestic violence.
Evidence concerning a victim’s character is not generally admissible to prove that a person acted in conformity with that character. In all eases except lflthose involving sexual conduct, evidence of the victim’s character may be offered where there is evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged. La.C.E. art. 404 A(2)(a).
Likewise, in the absence of a hostile demonstration or an overt act by the victim at the time of the offense charged, evidence of his or her prior threats against the accused is not admissible, subject to a similar proviso concerning plea of self-defense that is irrelevant in this. case.
In order to provide a foundation for such character evidence, the defendant must produce evidence that at the time of the incident, the victim did something that would have created in the mind of a rea *584 sonable person the notion that he was in immediate danger. State v. Gantt, 616 So.2d 1300, 1304-06 (La.App. 2 Cir.1993), writ denied, 623 So.2d 1302 (La.1993).
In this case, Harris testified that the victim was the aggressor in the altercation between him and Williams, and that the victim introduced deadly force by retrieving a gun from his car. This testimony was inconsistent with that of the other witnesses and was inconsistent with physical evidence. However, defense counsel tried to elicit only Ms. Harris’ personal opinion of the victim, not his general reputation in the community as a violent or peaceable person. The defense failed to establish that Ms. Harris knew the victim’s general reputation in the community. Indeed, she was never asked that question. The trial judge did not abuse his discretion in refusing to allow Ms. Harris to testify to her own personal, lay opinion as to the victim’s allegedly violent character. Likewise, if there was |inevidence that the victim had been arrested as a result of an altercation with Stella as counsel’s question suggests, the defense should have offered proper proof with a proper foundation, not the hearsay testimony of this witness.
In this case, it is clear that the jury did not find Harris to be a credible witness and rejected her testimony.
This assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: The State failed to prove beyond a reasonable doubt that Williams was guilty of manslaughter.
The standard of review of a defendant’s claim of insufficiency of the evidence is whether, after having viewed the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the offense to have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 660 (1979); State v. Rosiere, 488 So.2d 966 (La.1986).
If the evidence supports a conviction for the crime charged, whether or not the evidence fits the elements of the responsive verdict, then the conviction shall be affirmed, as long as the defendant did not object to the inclusion of the responsive verdict. State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), cert. den. 461 U.S. 969, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). In the instant case, Williams did not object to the verdict form.
In Second degree murder, the charged offense, is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1 A(1).
Counsel for Williams claims that the State did not prove the elements of manslaughter. Under the Elaire rule, however, the State need only show proof of the elements of second degree murder.
Williams’ claim is essentially based on counsel’s assertion that Ms. Harris’ version of the facts should prevail over the evidence given by Ms. Hall and the police witnesses. The trial jury observed the witnesses and examined the evidence. They chose to believe Ms. Hall’s account of the incident. Our review of the record in its entirety leads us to conclude that the jury was reasonable in making its evaluation of the relative credibility of the witnesses.
The jury was presented with evidence that Williams and his nephew shot the victim. Clearly, the evidence demonstrates specific intent to cause grave bodily harm to the victim on the part of both shooters.
Williams claims that the State failed to negate his claim of self-defense or defense of others with proof beyond a reasonable doubt. Ms. Harris’ testimony provides the only arguable basis for a finding that Williams acted in self-defense or defense of others. There is no direct evidence that Betty’s head wound was caused by the victim or more particularly by the *585 victim’s weapon. Only Ms. Harris claimed he was armed and there was no physical evidence of what she termed Betty’s “skull fracture.” It is reasonable to conclude that had the victim been Inarmed, one of the McDonalds or Lawrences would have mentioned this to the investigating officers or testified to this fact at trial. The jury had before it evidence from Ms. Hall that the victim was unarmed, on his knees when Williams shot him. This provides adequate evidence from which a rational jury could conclude that neither Williams nor his sister was in immediate danger.
The cases cited by Williams do not support Williams’ contention. In both State v. Carroll, 542 So.2d 762 (La.App. 4 Cir.1989), writ denied, 550 So.2d 625 (La.1989) and State v. Williams, 483 So.2d 999 (La.1986), the evidence demonstrated that the victims prevented the defendants from fleeing, respectively by wielding a barstool and by using a rifle to -bar defendants’ escape routes. In the instant case, it was the victim, not Williams, who was attempting to flee from the violence.
The jury in the instant case chose to accept Ms. Hall’s view of the evidence, that the victim was on the ground when Williams fired two shots into his body, one of which caused his death. Ms. Hall’s testimony was consistent with the forensic evidence, including aspirated blood in front of the house where the altercation took place. The State presented evidence through Ms. Hall and through the investigating officers that the victim was not armed at the time he was shot.
There is no evidence before the jury that Williams acted in self-defense. Hall testified that Williams introduced deadly force to the altercation by entering the fray with a gun drawn and aimed at the victim. The jury reasonably could have |13found that Williams had clearly available means to leave the conflict, by retreating or by entering the safety of his sister’s home.
This assignment of error is without merit.
CONCLUSION AND DECREE.
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.