MICHAEL E. KIRBY, Judge.
 

 ^¡STATEMENT OF CASE
 

 On May 17, 2006, Jasmine Sartain was indicted for the second degree murder of Christopher Smith and for a separate count of aggravated assault of a peace officer. The court arraigned him on June 8, and he pled not guilty to both charges.
 
 *1134
 
 The State severed the counts, and on October 4, 2007, at the conclusion of a three-day trial, a twelve-person jury found him guilty as charged of the second degree murder count. On November 9, the State nolle prosequied the assault count. The court denied Sartain’s motions for new trial and post-verdict judgment acquittal, and it sentenced Sartain to life imprisonment without benefit of parole, probation, or suspension of sentence. On that same date, the court granted Sartain’s motion for appeal.
 

 FACTS
 

 N.O.P.D. Reserve Off. Bruce Bono testified that on the afternoon of March 19, 2006, he was working a paid detail at a second line parade. Off. Bono testified that he had his motorcycle parked at the corner of S. Derbigny Street and Washington Avenue, making sure that no vehicles turned onto Washington. Off. RBono testified that the parade had stopped when he observed a Volvo stop at the corner. Off. Bono testified that he saw the defendant Jasmine Sartain exit the car from the front passenger seat. Off. Bono stated that he looked away, and he soon heard several gunshots. He stated that he looked back in time to see Sartain shoot a man. Off. Bono testified that he drew his weapon and ordered Sartain to stop. In response, Sartain turned and fled towards the Volvo. Off. Bono fired at Sartain three times, and Sartain entered the car and then exited through the driver’s door and ran toward S. Claiborne Avenue. Off. Bono gave chase, and soon he saw another officer coming toward them from the opposite direction. Off. Bono testified that Sartain threw his gun under a vehicle parked along the street and surrendered. Off. Bono testified that when he turned around after hearing the first shots, he did not see anything in the victim’s hands, and he stated that he had not noticed the victim prior to the shooting. He testified that he did not hear anyone say to watch out prior to hearing the first shots. He also did not notice Sartain speaking with any females prior to the shooting. He estimated that thirty seconds to a minute elapsed between the time he saw Sartain exit the Volvo and when he heard the shots. He also estimated that he was twenty to twenty-five feet from Sartain when he turned and saw Sartain shoot the victim. He testified that he surrendered his gun to officers who arrived to investigate the shooting.
 

 On cross-examination, Off. Bono testified that he saw nothing unusual when the Volvo pulled up to the corner. He stated that Sartain fell to the ground after throwing his gun under the parked vehicle. He testified that he did not investigate the shooting and did not know if anyone found any witnesses to the shooting. On redirect, Off. Bono testified that the last shot he heard was the one he saw Sartain Isshoot at the victim. He stated that the victim’s back was to a fence, and there were other people about five feet from the shooting scene.
 

 Sgt. Christopher Goodly of the N.O.P.D. Traffic Division testified that he was also working a detail for the parade, and he was located at the corner of Washington and S. Claiborne. He testified that the bulk of the parade was at S. Derbigny and Washington, where Off. Bono was stationed. Sgt. Goodly testified that he heard shots and saw the crowd scattering. He stated that he saw Off. Bono firing his gun and saw a shot hit a Volvo. He stated that the driver’s door to the car was open, and he saw a man emerge from the car with a gun in his hand. He stated that the man, whom he identified as Sartain, ran toward him. He stated that Sartain was not looking at him, but rather he was waving his gun around, and Off. Bono was running after Sartain. He stated that he heard
 
 *1135
 
 Off. Bono yell that “he dropped it.” He then stepped into Sartain’s path, and Sar-tain dropped to the ground. Sgt. Goodly testified that he handcuffed Sartain and waited for other officers to arrive. He stated that he located a gun under a vehicle parked at the side of the street that resembled the gun that he had seen in Sartain’s hand. He stated that he called for backup and for EMS personnel.
 

 On cross-examination, Sgt. Goodly testified that he apprehended Sartain at approximately the middle of the block. He stated that although it took some time for crime lab personnel to arrive on the scene, he and other officers secured the scene as soon as the other officers arrived. Although he admitted that it was possible that someone could have picked up evidence before the scene was secured, he stated that it was highly unlikely that anyone had done so because he saw no non-police people in the area after the shooting as they had all run away when the shooting started.
 

 14Pet. Larry Green testified that he directed the investigation of the shooting. He stated that Sartain and the two shooting victims had been transported to hospitals by the time he arrived on the scene. He testified that he directed Det. Bethea to visit Sartain at one hospital and he directed Off. Waguespack to visit the victims who had been transported to another hospital. He identified various photographs taken at the scene. He stated that after the other officers had spoken with one of the victims and with the suspect, he ordered that Sartain be arrested. He stated that he prepared the police reports in the case. Det. Green testified that he did not interview anyone on the scene, nor did he assign anyone to go back out to the scene to interview people in the area. He stated that no one came forward to give information about the shooting, and he denied that anyone named Kayla Boatner contacted the police to speak about the shooting.
 

 Off. George Waguespack testified that he went to the hospital where the two shooting victims had been taken. He identified the victims as Christopher Smith (the deceased) and a bystander named Roosevelt Webster, who had been wounded in the shootout. Off. Waguespack testified that he briefly spoke with Webster, who had a minor wound to his leg and who was treated and released. He stated that he tried to speak with Smith, but he was unable to do so because doctors were tending Smith’s wounds. Off. Waguespack testified that he collected Smith’s clothing and a bullet that fell from the clothing as it was being removed from Smith’s body.
 

 Det. Ronald Ruiz testified that the Volvo was towed from the scene after the crime lab finished processing the scene. He stated that he obtained a search warrant for the Volvo and searched it the day after the shooting. He stated that the Volvo had a bullet hole in the front passenger door, and he collected a bullet from 1 Binside the door. He stated that he also seized from the car a photograph depicting Sar-tain, an unknown female, and a gun.
 

 Det. Gus Bethea testified that he briefly went to the scene of the shooting and then went to the hospital where Sartain had been taken. He stated that Sartain was waiting to be treated in the emergency room when he arrived, and a doctor there told him that Sartain had not been given any medication at that time. Det. Bethea testified that he introduced himself to Sar-tain and advised Sartain of his rights. He stated that Sartain indicated that he understood his rights and wanted to waive them to give his side of the story. Det. Bethea testified that Sartain told him that he was in the Volvo with Mitchell Lee and Brendel Edwards, and they had stopped at
 
 *1136
 
 the intersection to speak with some females. Sartain told Det. Bethea that all three men exited the car, and then they saw Smith approaching them from behind a car. Sartain told Det. Bethea that Smith had a gun and began shooting at them, so he and his friends pulled their guns and returned fire. Sartain told Det. Bethea that the last thing he remembered was being shot by a police officer.
 

 Det. Bethea testified that he recorded Sartain’s statement on a device that would allow him to burn a CD or put it on a computer’s hard drive. However, the device malfunctioned, and he was unable to store it or burn a CD. Det. Bethea stated that he took notes during Sartain’s statement, and he gave the notes to Det. Green. Det. Bethea stated that he did not interview either Lee or Edwards, and he did not know if anyone else interviewed them. On cross-examination, Det. Bethea stated that Sartain had a gunshot wound to his leg, and he interviewed Sartain approximately three hours after the shooting and prior to his surgery.
 

 The parties stipulated that Dr. Richard Tracy was an expert in forensic pathology. Dr. Tracy testified that he conducted the autopsy on Christopher Smith. | f;Dr. Tracy testified that Smith sustained five gunshot wounds, one of which was almost immediately fatal. Dr. Tracy could not determine the chronological order of the wounds, but he identified them as: (1) a wound that entered the left side of Smith’s face near the mouth and exited below his jawbone; (2) a wound that entered the left side of Smith’s chest under the elbow and exited near the spine, but did not strike any vital structure; (3) another wound parallel to wound (2), also not fatal; (4) a wound that entered the lower left chest and struck the renal artery, the left kidney, and the left lung, and then exited near the spine; and (5) a superficial wound just beneath the skin of Smith’s thigh, just below the groin. Det. Tracy testified that the fourth wound was the fatal wound, with the damage causing massive bleeding. Dr. Tracy stated that none of the wounds showed any gunpowder residue or stippling that would be present if the shots had been fired from near the victim.
 

 Det. Kenneth Leary was qualified as an expert in firearms examination. He examined the two guns seized in this case, Off. Bono’s gun and the gun seized from under the vehicle where Off. Bono saw Sartain throw his gun, as well as various casings and bullets recovered from the scene and from the Volvo. Det. Leary testified that his examination indicated that casings found on the scene were fired from both Off. Bono’s gun and the gun recovered from under the vehicle, but none of the casings found on the scene were fired from a third gun. Det. Leary thus testified that there was no indication from the evidence found at the scene that a third gun was involved in the shooting.
 

 Off. Chana Pichón testified that she was the crime lab technician who processed the scene of the shooting. Off. Pichón testified that she photographed the scene and collected the evidence. She stated that other officers had secured the |7scene by the time she arrived. She stated that she did not search through any leaves that may have been in the gutter of the street, nor did she use a metal detector at the scene.
 

 The defense called Kayla Boatner, who stated that she was a former girlfriend of Sartain. Ms. Boatner testified that she moved to Texas after Hurricane Katrina, but on the day of the shooting she was visiting in New Orleans, and she and her friend Makiah were on Washington Avenue watching the second line parade. Ms. Boatner testified that she heard someone call her name, and she saw Sartain sitting
 
 *1137
 
 in a car at the corner. Ms. Boatner stated that she and Makiah walked over to the car, and Sartain and one of his companions exited the car to talk with them. She stated that she and Sartain spoke for a short time, and then Makiah screamed, “He got a gun!” Ms. Boatner testified that she looked up and saw a man approaching them. She stated that she warned Sartain to watch out, and Sartain drew a gun. She stated that Makiah grabbed her, and the two women ran from the scene. She testified that she heard gunshots as they ran. Ms. Boatner testified that the man she saw with the gun was named Chris, but she did not know him.
 

 On cross-examination, Mr. Boatner testified that she had seen Chris twice before, and Sartain had told her that his name was Chris. Ms. Boatner testified that she returned to Texas the day after the shooting, but she kept in contact with Sartain while he was in jail. She stated that she did not contact the police concerning the shooting because she did not know whom to call. She stated that the defense attorney contacted her shortly before trial. She insisted that although she had dated Sartain sporadically for six years, she would not lie for him because he cheated on her during those six years.
 

 |sMakiah Bickham testified that she was with Ms. Boatner at the scene of the shooting. She stated that as she and Ms. Boatner were walking down Washington, someone called Ms. Boatner’s name. She stated that she and Ms. Boatner walked toward the car, and Sartain exited to speak with them. Ms. Bickham testified that she did not pay attention to the conversation between Sartain and Ms. Boat-ner. She stated that she looked up and saw a man coming from behind a car, and he was drawing a gun from under his shirt. Ms. Bickham shouted that the man had a gun, and Ms. Boatner warned Sar-tain to be careful. Ms. Bickham testified that she and Ms. Boatner ran from the scene, and she heard shots. She testified that she did not speak with the police about the shooting.
 

 On cross-examination, Ms. Bickham stated that she knew Sartain through his grandmother, whom she knew. She stated that Sartain and possibly one or two of his companions had exited the car before the shooting. She stated that she did not know the man whom she saw draw the gun, although Ms. Boatner later told her who he was. Ms. Bickham testified that she did not contact the police concerning the shooting because she feared she would lose her job if she had to come to court to testify.
 

 Tashaka Johnson testified that she was Sartain’s girlfriend. She stated that at the time of the shooting, she and Sartain had dated for six years and were engaged, She stated that she was living with Sartain at his grandmother’s house. She stated that she owned a green Volvo that she let Sartain use. She testified that she also knew Smith and had dated him in the past. She stated that Sartain and Smith did not get along. She testified that she was not on the scene of the shooting, and she had not willingly come to court to testify.
 

 |flOn cross-examination, Ms. Johnson testified she began living with Sartain at his grandmother’s house when he was released from jail. She stated that she dated Smith in middle school, and she did not think that Sartain was jealous of Smith. She stated that she did not own a gun and had never seen Sartain with one.
 

 Jasmine Sartain testified that he was twenty years old at the time of trial. He stated that at the time of the shooting he was living with Ms. Johnson at his grandmother’s house, and Ms. Johnson allowed him to use her car. He stated that on the
 
 *1138
 
 day of the shooting, he, Lee, and Edwards took the Volvo to get some food, and they encountered the second line parade. He testified that as they were sitting at a corner, he saw Ms. Boatner and Ms. Bick-ham. He stated that he exited the car to talk with them, and then he heard someone yell that someone had a gun. He stated that he turned and saw Smith, whom he knew had dated Ms. Johnson in the past. Sartain testified that Smith was pointing a gun at him, and he drew his gun and fired at Smith. Sartain testified that he carried the gun because he had been shot several times by “the same young man.” The State objected, the parties conducted a bench conference, and the court instructed the jury to disregard Sar-tain’s last comment. Sartain testified that he and Smith were practically facing each other when he shot Smith, and he insisted that he shot Smith before Smith could shoot him. Sartain testified that he did not remember how many times he shot Smith, and he did not remember hearing the officer warning him to stop; instead, he heard more shots and ran. He stated that he re-entered the Volvo and then exited again when bullets hit the car. He testified that he did not realize he had been shot until after he surrendered. Sar-tain insisted that he was not trying to harm anyone but Smith, whom he only shot in self-defense. Sartain admitted he had a prior conviction for possession of crack cocaine. He also admitted that he did not Imhave a permit to carry his gun, but he insisted that he carried the gun because he had been shot multiple times in the past.
 

 On cross-examination, Sartain admitted that although he shared Ms. Johnson’s car, he was not driving it the day of the shooting because he did not have a driver’s license. He denied looking for Smith on the day of the shooting. He admitted that he was on probation at the time of the shooting and should not have been carrying a gun. He stated that he was unsure if Smith had returned to the city after the storm, but he nonetheless carried the gun because he was afraid of Smith. Sartain denied telling the police that he and his two friends were shooting at Smith; he did not remember if his friends even had guns that day. On redirect, Sartain testified that he had not spoken with Lee or Edwards since the day of the shooting, and he did not know their whereabouts. He denied that Smith was running away from him when he shot him.
 

 On rebuttal, the State called Off. Bono, who testified that Smith was standing near a fence when Off. Bono saw Sartain shoot him. Off. Bono testified that he did not see anything in Smith’s hands, and Smith was not shooting at Sartain.
 

 DISCUSSION AND RECOMMENDATION
 

 A.
 
 Errors Patent
 

 A review of the record reveals there are no patent errors.
 

 B.
 
 Assignments of Error
 

 Assignment of Error No. I.
 

 |nBy his first assignment of error, the appellant contends that the trial court should have granted a mistrial due to prejudicial argument by the prosecutor during closing argument. By a portion of his second assignment, he argues that the trial court erred by denying his motion for new trial based in part on the trial court’s failure to declare a mistrial based upon the prosecutor’s improper argument. The statements to which the appellant refers are as follows:
 

 You are here today because you live in the City of New Orleans. And I’m here today to tell you that if you want to take your city back, you need to do it today.
 
 *1139
 
 You need to do it right here. You need to do it right now and you need to do—
 

 Defense counsel objected, and the court sustained the objection. Later during argument, the prosecutor stated:
 

 And he lied to you. And he lied to you because he wants to get out of jail. Go back to his life.
 

 We hear about guns and drugs all the time. Wouldn’t you rather be known for second line and Mardi Gras—
 

 Again, defense counsel objected, and the court sustained the objection.
 

 The appellant now argues that the court should have entered a mistrial in the case or have granted a new trial due to its failure to declare a mistrial based upon these improper statements by counsel, the former of which he characterizes as a plebiscite on crime and the latter of which he characterizes as a comment on other crimes evidence. However, the trial court did not err in failing to grant a mistrial because the appellant did not request one as required by C.Cr.P. arts. 770 and 775. See
 
 State v. Woodfork,
 
 2007-1396 (La.App. 4 Cir. 3/19/08), 981 So.2d 717;
 
 State v. Williams,
 
 2006-1327 (La.App. 4 Cir. 1/23/08), 977 So.2d 160. Because counsel did not request a mistrial with respect to either statement, the court granted l^the only relief requested by counsel. Counsel cites numerous cases to support his conclusion that these statements were improper, but in none of the cases did the court reverse the defendant’s conviction in the absence of a motion for mistrial. Thus, the trial court did not err by failing to declare a mistrial in the absence of a request from defense counsel, nor did it err by not granting a new trial based upon this failure. These claims have no merit.
 

 Assignment of Error No. II.
 

 By his third assignment of error, the appellant contends that the trial court erred by denying his motion in limine which prevented the defense from presenting evidence of the victim’s prior shooting of the appellant. By his second assignment, he argues in part that the trial court erred by denying his motion for new trial based on this argument. By his fourth assignment, he asserts that the trial court erred by denying his motion for mistrial based upon this error.
 
 [1]
 
 He contends that he should have been allowed to present evidence of this prior shooting by the victim to bolster his self-defense claim.
 

 Immediately prior to the start of the first day of trial, the defense moved to allow it to introduce evidence that the victim Christopher Smith shot the appellant on September 26, 2004 on Frenchmen Street. Defense counsel indicated that he had no police report concerning the incident but he had hospital records that showed that the appellant was shot six times on that date. The court noted its consternation that the defense had waited until the start of trial to first mention this incident. The State noted that it had no police report on this incident, but it had | ^information that two years prior to this supposed shooting, the appellant shot Smith. Nonetheless, the State had no plans to introduce evidence of the 2002 shooting. The court issued an instanter subpoena for the officer who investigated the 2004 shooting, but the court indicated that it would not allow testimony about this shooting unless there was something other than the appellant’s testimony to show that Smith had shot him. The court tabled the motion and warned both sides not to mention the incident during voir
 
 *1140
 
 dire. The State filed a motion in limine to prohibit any questioning concerning the 2004 incident, which the court granted. The defense noted its objection.
 

 On the next day of trial, the State re-urged its motion in limine, and the court replied that it had already ruled on the motion, noting that it had nothing before it, other than the appellant’s anticipated testimony, showing that Smith had shot the appellant. The court noted that it would allow the defense to present evidence that Smith was armed at the time of the murder. Defense counsel noted that the appellant told others at the scene of the 2004 shooting that Smith had shot him, but the court noted that it had nothing else before it showing that Smith was the shooter in that incident. The State noted that it had been in contact with the investigating officer for the 2004 shooting, and he did not have a copy of the police report. The State also noted that it had run the date and place of the shooting in its computer, and it could find no police report concerning it. The court cautioned both sides not to mention the 2004 shooting during opening statements.
 

 Later that day, during the lunch break, the court noted that it had reviewed the medical records, and they did not contain any information concerning who shot the appellant. The court noted that it would not allow the defense to present this evidence, terming it misleading and confusing to the jury, and it noted that the only | uevidence of the identity of the shooter in the 2004 incident was the appellant’s own self-serving statement that Smith shot him. Defense counsel reiterated that the appellant told others on the scene that Smith shot him, and the court asked if he told this to the police. When defense counsel responded that no one was ever arrested for the shooting, the court rejoined that was because the appellant did not tell them who shot him. Defense counsel insisted that the appellant’s mother told an officer that Smith had shot him, and the officer indicated that he knew of Smith. Counsel stated that the shooting occurred in front of the house of Tashaka Johnson, the appellant’s girlfriend, and the appellant told her that Smith had shot him. Counsel admitted, however, that Ms. Johnson did not see the shooting because she was inside when it occurred. The court then again denied the motion to introduce this evidence.
 

 Still out of the jury’s presence, the court called Det. Corey Lymous, the officer who investigated the 2004 shooting. Det. Ly-mous did not have a copy of the police report, but he testified that he remembered that the appellant had been shot. He stated that he did not remember if he actually spoke with the appellant, but he did speak with the appellant’s mother. He stated that if she had given him the name of the perpetrator, he would have arrested that person. He indicated that the shooting would have generated a police report. He testified that he did not remember interviewing Ms. Johnson. He indicated that he could not remember for certain what he was told during the investigation, but he stated that he was one hundred per cent sure that no suspect was developed in the shooting, and if anyone had given him a name, he would have obtained a warrant for that person’s arrest. He also stated that if Christopher Smith’s name had been given to him, it would have been reflected on Smith’s rap sheet. He testified that he remembered the | ^shooting because the appellant was well-known in the neighborhood, he remembered that the appellant was in the ICU at Charity Hospital, and he remembered speaking with the appellant’s mother.
 

 Defense, counsel then stated that Ms. Johnson and her sister were available to
 
 *1141
 
 testify as to the 2004 shooting, and he indicated that he wanted to call these witnesses and the appellant and his mother for the limited purpose of testifying that the appellant told an officer on the scene who shot him. The court denied that request. Det. Lymous then returned to the stand, and the State showed him a printout for calls for police service for September 26-30, 2004 for the block where the shooting supposedly occurred, and the printout showed no calls involving shootings or guns.
 

 During Ms. Boatner’s testimony, when identifying the man she said had a gun, she stated that he was named Chris and that she had seen him after “the first incident,” possibly a reference to the 2004 shooting.
 

 The next day of trial, defense counsel reiterated his request to present evidence of the 2004 shooting, pointing out that evidence of self-defense had been elicited through the testimony of Ms. Boatner and Ms. Bickham. He argued that this evidence was necessary to show the appellant’s state of mind at the time of the shooting, but the court again denied the request because there was no evidence, other than the appellant’s testimony, that the victim was the person who shot him in 2004. The court stated that the defense could present evidence of self-defense, but it could not present any evidence of the 2004 shooting. The court also admonished both parties to instruct their witnesses not to mention the 2004 shooting.
 

 17 (¡During the appellant’s direct testimony, in response to counsel’s question on why he was carrying a gun on the day of the shooting, the appellant replied: “Well, because prior to that I had been shot several times by the same young man ...” The State objected, and the court held a bench conference, after which it admonished the jury to disregard the appellant’s last comment. The court then called a recess, during which it instructed defense counsel and the appellant not to mention the 2004 shooting. The court did not rule on the State’s motion to hold the appellant in contempt.
 

 The appellant now argues that the trial court’s ruling prevented him from presenting evidence that would have corroborated his claim of self-defense and show his state of mind at the time of the shooting. In
 
 State v. Van Winkle,
 
 94-0947, pp. 5-6 (La.6/30/95), 658 So.2d 198, 201-202, the Court discussed a defendant’s right to present a defense:
 

 A criminal defendant has the constitutional right to present a defense. U.S. Const, amend. 6; La. Const. Art. 1 § 16;
 
 Washington v. Texas,
 
 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967);
 
 State v. Gremillion,
 
 542 So.2d 1074 (La.1989);
 
 State v. Vigee,
 
 518 So.2d 501 (La.1988). Due process affords the defendant the right of full confrontation and cross examination of the State’s witnesses.
 
 Chambers v. Mississippi,
 
 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973);
 
 State v. Mosby,
 
 595 So.2d 1135 (La.1992). It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
 

 Evidentiary rules may not supersede the fundamental right to present a defense. In
 
 State v. Gremillion,
 
 supra, the defendant attempted to introduce evidence that third parties, rather than the defendant, had killed the victim. The evidence consisted of a statement that the victim had made to a sheriffs deputy who investigated the crime. The statement was that he had been attacked and beaten by three white males. The trial court and the Court of Appeal both held the statement was inadmissible hearsay. We agreed that the statement was hearsay and that it did not
 
 *1142
 
 meet any applicable 117exception (res gestae, dying declaration, business records). However, we concluded that normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant’s right to present a defense. See
 
 Chambers v. Mississippi
 
 410 U.S. at 302, 93 S.Ct. at 1049. Exclusion of the statement in
 
 Gremillion
 
 impermissibly impaired the defendant’s fundamental right. 542 So.2d at 1079, citing
 
 State v. Washington,
 
 386 So.2d 1368 (La.1980).
 

 Similarly, in
 
 State v. Vigee,
 
 supra, we held that hearsay evidence supporting the defendant’s theory of the case and undermining the State’s lead witnesses was relevant; excluding it mandated reversal. The defendant may always assert that someone else committed the crime.
 
 Chambers v. Mississippi supra; State v. Ludwig,
 
 423 So.2d 1073 (La.1982).
 

 In
 
 Van Winkle,
 
 the defendant was arrested for the suffocation murder of her son, whose body was found in his bedroom. The defense theory was that a man who also lived in the apartment was a homosexual hustler who brought home another man, and that the two men killed the boy. To support this theory, the defense sought to question the roommate about his source of income and his sexual activities. It also sought to question the coroner about the condition of the victim’s anus, the State’s chemist concerning the absence of sperm in the anal swabs and whether this would automatically discount sexual activity, and bartenders at the bar that the roommate frequented concerning the nature of the bar. The trial court refused to allow this questioning, and the defendant was convicted of her son’s murder. The Court reversed the conviction, finding that this ruling prevented the defendant from presenting evidence relevant to her defense that someone else committed the murder. The Court further found that the error was not harmless in that the evidence that the defendant could not introduce may have contributed to |iathe verdict, given the fact that the evidence against the defendant was only circumstantial. The Court remanded the case for a new trial.
 

 In
 
 State v. Stukes,
 
 2005-0892 (La.App. 4 Cir. 10/25/06), 944 So.2d 679, writ den. 2006-2654 (La.6/29/07), 959 So.2d 518, the defendant was convicted of two counts of aggravated battery stemming from an argument that occurred at a bar after a Saints game. The defendant exchanged words with one of the victims over a comment that the defendant made to the man’s female companion, and as the man and the woman walked into the bar, the defendant opened fire and shot the man and another male companion. One of the victims, his female companion, and a disinterested witness testified that the defendant went to a nearby car and retrieved a gun, which he used in the shooting. Although the victim and his companions denied having any weapons that night, a defense witness testified that she heard the defendant say just prior to the shooting, “If you’re going to shoot me, shoot me.” She also testified that the man with whom the defendant was arguing reached under his shirt for a silver object. Another defense witness testified that shortly after the shooting a man hurried into the bar and handed a silver gun to someone standing by the door. The defendant testified that he shot the victim when the victim pulled a gun on him. The court did not allow the defense to call the defendant’s wife to testify as to what the defendant told her when he arrived at home after the shooting concerning what had occurred at the bar. The defendant filed a motion for new trial, alleging among other things that this ruling deprived him of his right to present his
 
 *1143
 
 defense by showing the reasons for his actions after the shooting, i.e. disposing of the gun and his clothing. The trial court granted the motion for new trial, and the State sought writs. This court reversed, noting that the defendant and other witnesses testified as to these reasons. The court found l13that the defendant’s wife’s anticipated testimony would have at best been cumulative to the defendant’s testimony.
 

 In so finding, this court discussed other cases:
 

 In
 
 State v. Juniors,
 
 2003-2425 (La.6/29/05), 915 So.2d 291, the defendant was charged with killing one man and wounding another at a business. His codefendant, who formerly worked at the business, pled guilty in exchange for his testimony against the defendant. The defendant sought to introduce three items to impeach his codefendant’s credibility: (1) the portion of the hospital record of the deceased victim which stated the victim had been shot by a “disgruntled employee;” (2) the results of his codefendant’s drug test taken in connection with his employment with the business; and (3) a letter purportedly written by the codefendant in which he indicated he would testify that neither of them had anything to do with the murder. The trial court refused to allow the defendant to introduce any of these items. On appeal, the Court upheld the rulings as to the first two items. With respect to the first item, the victim never regained consciousness; thus the statement as to who shot him was from an unknown declarant and as such double hearsay and inadmissible, even if the rest of the hospital record was admissible. As to the second item, the report was not prepared by the business, but rather by another company which administered the test, and the defendant did not call the person who was the custodian of that record. In addition, the Court noted that the defendant was able to introduce the codefendant’s employment records which included his pink slip. Also, the Court noted that the defendant could have elicited testimony concerning the reason for the termination of the codefendant’s employment, but he failed to do so. Finally, with respect to the letter purportedly handwritten by the codefendant, the Court found that the trial court erred by refusing to allow its introduction because it could have been used to impeach the codefendant. Nonetheless, the Court found the error to be harmless in light of the facts that the defendant’s fingerprints were found at the scene, his gun matched a bullet found at the scene, and another witness testified that she saw a car with two men parked at the post office lot just prior to the murder, corroborating the codefendant’s testimony that he waited in the car at the post office while the defendant committed the crime.
 

 lanln
 
 State v. Cosey,
 
 97-2020 (La.11/28/00), 779 So.2d 675, the defendant was charged with the rape and murder of a twelve-year-old girl. A man who lived across the street from the scene of the crime implicated the defendant. The trial court refused to allow the defendant to introduce evidence of the man’s history of violent criminal behavior and the fact that the man killed himself after murdering his baby and the baby’s mother in order to show that man could have committed the crime. The Court upheld the trial court’s ruling, noting that the man’s prior crimes were not similar to the present one and that the defendant was able to show that the man made obscene phone calls to the victim’s mother. In addition, the defendant was able to question police officers
 
 *1144
 
 about their failure to investigate the man, even though he lied to the police, gave them false leads, and was seen with the defendant on the night of the murder, although there was no evidence to tie him to the crime scene.
 

 In
 
 State v. Vigee,
 
 518 So.2d 501 (La.1988), the State presented evidence that police officers observed a drug transaction involving two pedestrians and a seller in a car. As the officers approached the car, the pedestrians fled. The officer who stopped the car testified that he saw the driver, the defendant, reach behind him. Fearing the defendant was reaching for a gun, seeing the dome light in the car go on, and hearing the car accelerate, the officer drew his gun. He stated that when the car lurched forward, it hit him and his gun discharged, striking the defendant. The officers subsequently seized several packages of heroin from the car. By contrast, the defendant testified the car had just been purchased by a friend, and he was taking the car for a test drive when the officers stopped him. He testified that the friend directed him to stop at a certain corner, and when he did so someone approached him from behind and put a gun to his head. He testified that when he leaned to the side to avoid the gun, the gun fired, striking him. He testified he had left the car in drive, and when he was shot the car sprang forward. He contended that the car had previously belonged to a known drug dealer, and he theorized that was why the officers approached him with their guns drawn. The trial court denied his effort to introduce evidence that at the time of the offense the car belonged to a known drug dealer, as well as evidence that his friend tried to get someone to lie to give the friend an alibi. On appeal, the Court found that the trial court erred by refusing to admit this evidence. In addition, the Court | ^ found that this error was not harmless, given the fact that the jury returned a lesser included verdict of simple possession of heroin, apparently disbelieving the officers’ testimony that they saw a drug transaction.
 

 In
 
 State v. Short,
 
 94-0283 (La.App. 4 Cir. 5/16/95), 655 So.2d 790, the defendant was charged with the aggravated rape of his stepdaughter. He wanted to present evidence to show: (1) that his wife was having an affair and was spending his paychecks while he was offshore; (2) that the victim liked the new boyfriend better than she liked him; and (3) that several other men, including the new boyfriend, had access to the victim. The defense was not allowed to delve into these matters, and the defendant was convicted. On appeal, this court rejected his claim that he was denied the right to present a defense. The court noted the defendant was allowed to question the victim concerning her bias against him, including her wish that the defendant and her mother were not married and her wish to live elsewhere. In addition, the defendant was allowed to testify that the victim had made a similar accusation against her mother’s former husband, and he was allowed to establish the existence of her mother’s boyfriend at the time of the alleged rape.
 

 In
 
 State v. Judge,
 
 99-1109 (La.App. 3 Cir. 3/1/00), 758 So.2d 313, the defendant was accused of sexual battery. The trial court refused to allow the defense to present evidence that the victim had told a police officer that she had been raped a few years earlier, but she had not reported the crime. The defendant proffered the victim’s testimony, wherein she testified an ex-boyfriend had raped her a few years earlier, but she
 
 *1145
 
 did not tell anyone until much later that it had happened. On appeal, the defendant contended the trial court erred by not allowing this evidence to be presented to the jury. The appellate court found no error.
 
 [2]
 

 State v. Stukes,
 
 2005-0892 at pp. 16-20, 944 So.2d at 689-690.
 

 1 lidere, the evidence that.the appellant sought to introduce was designed to show that the victim shot him in 2004. The appellant sought to introduce this evidence pursuant to La. C.E. art. 404 A, which provides in pertinent part:
 

 A. Character evidence generally.
 

 Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
 

 [[Image here]]
 

 (2) Character of victim, (a) Except as provided in Article 412 [not applicable here], evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible ...
 
 [3]
 

 In
 
 State v. Williams,
 
 96-1587, pp. 7-8 (La.App. 4 Cir. 4/16/97), 693 So.2d 249, 253-254, this court discussed the use of character evidence with respect to the victim of a crime:
 

 When a defendant pleads self-defense, evidence of the victim’s dangerous character or of threats against the defendant is relevant to show the victim was the aggressor and that the defendant’s fear of danger was reasonable.
 
 State v. Edwards,
 
 420 So.2d 663, 669 (La.1982);
 
 State v. Montz,
 
 92-2073 (La.App. 4th Cir.2/11/94), 632 So.2d 822, 824-825, writ denied, 94-0605 (La.6/3/94), 637 So.2d 499.
 

 For such evidence to be admissible, the defendant must first produce evidence that at the time of the incident the victim made a hostile demonstration or committed an overt act against him of such character that would have created in the mind of a reasonable person the fear that he was in the immediate danger of losing his life or suffering great bodily harm.
 
 State v. Gantt,
 
 616 So.2d 1300, 1304 (La.App. 2nd Cir.1993),
 
 writ denied,
 
 623 So.2d 1302 (La.1993). An overt act is any act which manifests to the mind of a reasonable person a present intention to kill or inflict great bodily harm.
 
 Edwards, supra
 
 at 669.
 

 Once evidence of an overt act is established, evidence of the victim’s threats to the defendant and of the victim’s dangerous character are admissible: (1) to show the defendant’s reasonable apprehension of danger justifying his conduct and (2) to help determine who was the aggressor.
 
 Edwards, supra
 
 at 670.
 

 If the purpose is to show the defendant’s reasonable apprehension of dan
 
 *1146
 
 ger, it must be shown that the defendant knew of the victim’s prior threats or reputation.
 
 Edwards, supra,
 
 at 670;
 
 State v. Eishtadt,
 
 531 So.2d 1133, 1135 (La.App. 4th Cir.1988). Once this knowledge is established, evidence of the victim’s character, both general reputation and specific threats or acts of violence against the defendant are admissible.
 
 Edwards, supra,
 
 at 670.
 

 If the purpose is to show that the victim was the aggressor, there is no requirement that the defendant know of the victim’s prior acts or reputation.
 
 Eishtadt, supra
 
 at 1135.
 

 See also
 
 State v. Williams,
 
 99-1581 (La.App. 4 Cir. 6/14/00), 766 So.2d 579.
 

 Here, although the defense did not present evidence of an overt act by the victim when it first moved to introduce evidence of the earlier shooting, later both Ms. Bo-atner and Ms. Bickham testified that the victim drew a gun prior to the shooting. Thus, if the evidence that the appellant sought to introduce had been of the proper form, it would have been admissible. The court found that it was not admissible, however, because the only direct evidence that the victim was the person who shot the appellant in 2004 was the appellant’s own testimony, which the court found to be self-serving and thus suspect. The defense admitted that the only person who saw the shooter was the appellant, and although the defense stated that the appellant’s mother, his girlfriend, and her sister heard the appellant tell the |?4police who shot him, the officer who investigated the shooting testified that no one ever identified the shooter.
 

 The cases cited by the appellant do not show that the trial court erred by refusing to allow the defense to present evidence of the 2004 shooting because the appellant’s own testimony was the
 
 only
 
 evidence that the victim perpetrated the shooting. In
 
 State v. Caldwell,
 
 504 So.2d 853 (La.1987);
 
 State v. Lee,
 
 331 So.2d 455 (La.1975);
 
 State v. Brooks,
 
 98-1151 (La.App. 1 Cir. 4/15/99), 734 So.2d 1232; and
 
 State v. Washington,
 
 30,043 (La.App. 2 Cir. 1/23/98), 706 So.2d 203, the courts held that the trial court erred by disallowing evidence from
 
 third parties
 
 concerning prior threats, etc., by the victim to show the defendant’s state of mind. In
 
 State v. Cavalier,
 
 421 So.2d 892 (La.1982);
 
 State v. Schexnayder,
 
 97-0729 (La.App. 1 Cir. 4/8/98), 708 So.2d 851; and
 
 State v. Demery,
 
 28,396 (La.App. 2 Cir. 8/21/96), 679 So.2d 518, the courts held that the defense failed to establish evidence of an overt act on the victim’s part where the defendant was the only person to testify as to an act.
 
 [4]
 

 State v. Whittaker,
 
 463 So.2d 1270 (La.1985) involved the admissibility of a letter written by the defendant to a friend who was also incarcerated and whom he urged to lie or be silent. In
 
 State v. Ludwig,
 
 423 So.2d 1073 (La.1982), the defendant sought to introduce evidence that the victim’s wife had shot the victim in the foot six months before the victim’s murder in an effort to show that she may have been the murderer. The Court found that although this evidence may have been slightly relevant, the trial court did not err by excluding it.
 

 | ssHere, the testimony of Ms. Boatner and Ms. Bickham showed evidence of an overt act by the victim. However, the only evidence that defense could present to show that the victim shot the appellant in 2004 was the appellant’s own self-serving testimony. Neither the appellant’s mother, Ms. Johnson, nor her sister, who the defense intended to call to corroborate the appellant’s testimony, saw the shooting; at
 
 *1147
 
 best, they could have only testified as to what the appellant told them. Defense counsel stated that the appellant’s mother could testify that she heard the appellant tell the police who shot him, but Det. Lymous emphatically testified that no one gave the police the name of a suspect. The appellant points out that a police report in the present case includes his statement that the victim shot him in 2004, but again this is the appellant’s own self-serving statement. Given that the appellant was the only person who could identify the victim as the person who shot him in 2004, and that it appears that the appellant did not give the victim’s name to the police during its investigation of that shooting, we conclude the trial court did not err by disallowing this testimony.
 

 Finally, it must be noted that contrary to the court’s ruling, the appellant testified that he had been shot “several times by the same young man,” meaning the victim. Although the court admonished the jury to disregard this testimony, the jury was nonetheless aware of this testimony. In addition, Ms. Boatner testified that she had seen the victim’s face before, after the first “incident.” Thus, even though the court denied the defense motion to present evidence of the earlier shooting, the jury was aware that the appellant thought that the victim had shot him in the past.
 

 Thus, these claims have no merit.
 

 | ^Assignment of Error No. III.
 

 The appellant alleges in assignment five that there was insufficient evidence adduced at trial to support his conviction. By assignment six, he alleges that the trial court erred by denying his motion for post verdict judgment of acquittal. By assignment two, he argues in part that the trial court should have granted his motion for new trial because the verdict was contrary to the law and evidence. Specifically, he contends that the State did not prove beyond a reasonable doubt that he did not shoot the victim in self-defense.
 

 The Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in
 
 State v. Brown,
 
 2003-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18:
 

 When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.”
 
 State v. Neal,
 
 00-0674, (La.6/29/01)[,] 796 So.2d 649, 657 (citing
 
 State v. Captville,
 
 448 So.2d 676, 678 (La.1984)).
 

 When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
 
 Neal,
 
 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under
 
 Jackson
 
 to prove guilt beyond a reasonable doubt to a rational jury.
 
 Id.
 
 (citing
 
 State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986)).
 

 See also
 
 State v. Batiste,
 
 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810;
 
 State v. Sykes,
 
 2004-1199, 2004-0947 (La.App. 4 Cir. 3/9/05), 900 So.2d 156.
 

 | jy/The appellant was charged with and convicted of second degree murder. Second degree murder is defined in pertinent part as “the killing of a human being: (1) When the offender has a specific
 
 *1148
 
 intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1. La. R.S. 14:10(1) defines specific criminal intent as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act.” Specific intent may be inferred from the circumstances and actions of the defendant.
 
 State v. Brown; State v. Williams,
 
 2005-0459 (La.App. 4 Cir. 1/18/06), 925 So.2d 567;
 
 State v. Hebert,
 
 2000-1052 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041. Specific intent can be formed in an instant.
 
 State v. Cousan,
 
 94-2503 (La.11/25/96), 684 So.2d 382;
 
 Williams.
 

 The appellant does not dispute that he shot the victim. Indeed, it would be hard to do so considering that Off. Bono testified that after hearing the first shots, he turned and saw the appellant shoot the victim. The appellant argues, however, that the State failed to prove that the shooting was not committed in self-defense, absolving him of guilt. In
 
 State v. McClain,
 
 95-2546, pp. 8-9 (La.App. 4 Cir. 12/11/96), 685 So.2d 590, 594, this court discussed self-defense:
 

 A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or receiving great bodily harm and that the homicide is necessary to save himself from that danger. La. R.S. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.
 
 State v. Lynch,
 
 436 So.2d 567 (La.1983);
 
 State v. Brumfield,
 
 93-2404 (La.App. 4th Cir.6/15/94), 639 So.2d 312. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger.
 
 State v. Dozier,
 
 553 So.2d 911 (La.App. 4th Cir.1989),
 
 writ denied
 
 558 So.2d 568 (La.1990). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger.
 
 Id.
 

 See also
 
 Batiste; State v. Jones,
 
 2001-0630 (La.App. 4 Cir. 3/20/02), 814 So.2d 623;
 
 State v. Gibson,
 
 99-0946 (La.App. 4 Cir. 5/3/00), 761 So.2d 670.
 

 In
 
 Batiste,
 
 the elderly defendant shot a much younger victim after a fight over money won in a dominos game. The defendant argued that his conviction could not stand because the victim started the fight and tried to keep him from leaving. This court rejected this argument, noting that the defendant left the game, went to his truck, armed himself, and came back to the game table, continuing the argument that led to the shooting.
 

 Likewise, in
 
 Jones,
 
 the defendant shot one victim to death and wounded another who came to the first victim’s aid. The defendant and the victim had fought earlier, but the victim left the area. He soon returned and raised his hands to the defendant, who then shot the victim repeatedly as the victim tried to run away. He shot the second victim when that victim tried to intervene. This court rejected the defendant’s claim that he only shot the intoxicated victims in self-defense, noting that the defendant could have left the area, but instead he armed himself and shot them both.
 

 In
 
 State v. Ventry,
 
 99-0302 (La.App. 4 Cir. 6/14/00), 765 So.2d 1129, this court rejected the defendant’s self-defense claim in light of the fact that although the defendant claimed he shot the victim as the
 
 *1149
 
 victim approached him, the victim was shot in the back. In
 
 Gibson,
 
 this court found that the State refuted the defendant’s self-defense claim. The defendant stabbed the victim, whom she claimed was choking her as they argued. This court noted that other witnesses who |?,awere in the house testified that they did not hear an argument prior to the stabbing. It also pointed to the defendant’s contradictory statements concerning whether the victim was choking her at the time she repeatedly stabbed him and her statement to the victim’s family that she did not know why she stabbed him. Likewise, in
 
 State v. Byes,
 
 97-1876 (La.App. 4 Cir. 4/21/99), 735 So.2d 758, this court rejected the defendant’s self-defense claim where he first stated that another person in the car shot the victim and then later admitted that he shot the victim when the victim pulled a gun. This court noted that two of the gunshots hit the victim in the back, and another witness testified that the defendant continued to fire after he exited the car.
 

 In
 
 State v. Osborne,
 
 2000-0345 (La.App. 4 Cir. 12/6/00), 775 So.2d 607, the larger, younger victim threatened the elderly defendant and hit him, knocking the defendant to the ground. The victim left the scene after others broke up the fight, but he returned and again threatened the defendant and his female friend. The defendant walked a short distance away, obtained and loaded a gun, and then returned to the scene. He shot the victim twice, the second time because he was not sure if the first shot hit the victim. Although the victim was much younger and bigger than the defendant and had threatened and hit him, this court rejected his self-defense claim, noting that the defendant could have left the area instead of arming himself and returning to the scene.
 
 [5]
 

 By contrast, in
 
 State v. Williams,
 
 483 So.2d 999 (La.1986), the Court found that the State failed to disprove that the defendant shot the victim in self-defense. A few days before the shooting, the victim had severely beaten the defendant and |.^threatened to kill him. On the day of the shooting, the defendant saw the victim approaching and tried to avoid him, but the victim confronted him, and the defendant shot the victim. Police officers found a rifle under the victim’s body, and the defendant insisted that he only shot the victim because he saw the barrel of a gun in the victim’s hands. The Court found that there was no evidence that the defendant provoked the victim or that he was the aggressor, and there was evidence that the defendant was trying to avoid the victim when the victim confronted him with a gun.
 

 Likewise, in
 
 State v. Carroll,
 
 542 So.2d 762 (La.App. 4 Cir.1989), the defendant shot the victim in a barroom after they had argued earlier in the day. While one witness testified that the victim’s arms were down when the defendant shot him, the bullet entered the victim under his arm, which would have been impossible if he had had his arm down at the time. This court reversed the defendant’s manslaughter conviction, finding that the evidence supported the defendant’s testimony and that of other witnesses that the victim charged the defendant while brandishing a barstool.
 

 Here, the appellant argues that this court should review both the evidence presented at trial
 
 as well as the evidence the
 
 
 *1150
 

 court did not allow him to present,
 
 in determining whether there was sufficient evidence to support his conviction. However, this court must consider only what was presented to the jury to determine if the evidence was sufficient.
 

 The appellant correctly argues that once he raised the issue of self-defense, the State had the burden negating this defense. He points out that Off. Bono admitted that he did not see the first three shots, and he also points to the testimony of Ms. Boatner and Ms. Bickham, who both testified that the victim approached |31the appellant with a gun. However, only two guns were recovered from the scene, those used by Off. Bono and the appellant. Sgt. Goodly testified that the scene was secured immediately after the shooting, as the pedestrians fled the scene during the shooting. In addition, Det. Leary testified that after testing the bullets and casings seized from the scene, he found that they had been fired from only two guns, those of Off. Bono and the appellant. Off. Bono testified that he did not see a gun in the victim’s hand when he turned after hearing the first three shots and saw the appellant shoot the victim.
 

 As for the testimony of Ms. Boatner and Ms. Bickham that the victim pulled a gun on the appellant, apparently the jury did not believe the testimony of the two defense witnesses. This court has repeatedly held that a factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence.
 
 State v. Huckabay,
 
 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093;
 
 State v. Harris,
 
 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. Given the evidence adduced at trial and listed above, it does not appear that the jury’s credibility finding was clearly contrary to the evidence. Viewing the evidence in the light most favorable to the State, the State presented sufficient evidence to negate the self-defense claim and support the jury’s finding that the appellant committed second degree murder. This claim has no merit.
 

 For the reasons stated above we affirm the defendant’s conviction and sentence.
 

 AFFIRMED.
 

 [1]
 

 . The trial transcript reveals that the motion for mistrial referenced by the appellant in connection with this claim was actually raised in connection with Ms. Boatner's testimony that the appellant had been in jail,
 

 [2]
 

 . See also
 
 State v. Washington,
 
 99-1111 (La.App. 4 Cir. 3/21/01), 788 So.2d 477, where this court found that the trial court did not err in granting a motion in limine prohibiting the defense from questioning the arresting officer about allegations made in a newspaper article concerning misconduct by the officer for which he had not been charged.
 

 [3]
 

 .. The remainder of 404(A)(2), dealing with prior acts against a defendant in a domestic setting, is not applicable to the facts of this case.
 

 [4]
 

 . But see
 
 State v. Collins,
 
 432 So.2d 369 (La.App. 1 Cir.1983), where the court earlier held that a defendant’s testimony alone was sufficient to show an overt act by the victim.
 

 [5]
 

 . Other cases where courts rejected self-defense claims are
 
 State v. Price,
 
 93-1472 (La.App. 4 Cir. 4/14/94), 635 So.2d 1298;
 
 State v. Moore, 568
 
 So.2d 612 (La.App. 4 Cir.1990);
 
 State v. Green,
 
 505 So.2d 265 (La.App. 3 Cir.1987);
 
 State
 
 v.
 
 Ruff,
 
 504 So.2d 72 (La.App. 2 Cir.1987); and
 
 State v. Dill,
 
 461 So.2d 1130 (La.App. 5 Cir.1984).